## MARIE DUTCHER v. WABASH RAILROAD COMPANY, Appellant.

### In Banc, March 1, 1912.

1 NEGLIGENCE: Humanitarian Rule: Settled Law. Although plaintiff was a trespasser and, in full possession of all her faculties, walked for a quarter of a mile on defendant's track without looking behind her for a train, it will not be held she was guilty of such palpable contributory negligence as defeats her recovery as a matter of law, regardless of defendant's own negligence. Even under such circumstances, if those in charge of the locomotive saw her and realized her danger, it became their duty to do what they could, with the means at hand, to avoid injuring her. That is the humanity doctrine, which has become a fixed principle in the law of negligence. That rule is: When one is negligently upon a railroad track,

unconscious of his immediate peril, and that peril is timely discovered by those in charge of the engine, they may not punish him for his negligence by knocking him off, but must use due care to avoid injuring him.

2 ———: ———: **Due Care.** The gauge of due care arises precisely with the obvious danger and the circumstances of the individual case. In one case the monotonous stroke of the bell might be the due care which those in charge of the engine must use to avoid injuring a trespasser on the track; in other cases the alarm whistle timely given might be due care; in an extreme case nothing short of stopping the train would be due care.

3. ———: ———: ———: **Trespassers: Duty to When Seen.** Those in charge of the engine are under no duty to lookout for a trespasser on the railroad track in the country away from congested populations and between public crossings, absent a known and permitted public user; but excepting the duty not to look out for trespassers, the duty to use due care not to kill or maim them if they are seen in time, is precisely the duty owed to those not trespassers.

4. ———: ———: **Alarm Signals: Intervening Confusion.** When a condition intervenes to confuse or prevent a trespasser on the track from hearing an alarm signal, or where the conduct and actions of the trespasser walking on the track with his back to an oncoming locomotive should cause an engineer of ordinary prudence to conclude that such party does not or cannot hear alarm signals, and he continues to walk on the track, the right of the engineer to act upon the presumption that the trespasser will leave the track before being struck ceases.

5. ———: ———: **Duty to See: Applicable to Defendant.** He who shuts his eyes when to open them and look is to see, is presumed to see. And this truism applies to defendant as well as to plaintiff, when due care requires defendant to see.

6. ———: ———: **Duty to Woman on Track.** The engineer of a train is chargeable with the duty to know and realize that the actions of a young woman walking on a railroad track, with her back to him, in the open country between public crossings, her hat in her hand, never looking back and apparently oblivious to danger, unmistakably indicate that she has not heard the crossing signals behind her. It is not natural for a woman to trifle with death by remaining on the track after hearing the alarm signals behind her; and natural instincts constitute evidence to men of sense.

Dutcher v. Railroad.

7. ———: ———: ———: Noise from Train on Near-by Track. On parallel railroads, 100 feet apart, two freight trains were moving in opposite directions. The one on defendant's road was running extra, was 510 feet long, made up of twelve loaded freight cars, the rear four of which were non-air cars, but the other eight and the engine well equipped with air, and the train was running from twenty-five to thirty miles an hour, on an upgrade of twenty-seven feet to the mile, on a track that lay on a fill. The other train consisted of twenty-five freight cars, was over 1000 feet long, running about twenty miles an hour on a slightly down grade, and made a great deal of noise. Plaintiff, a school teacher, nineteen years of age, in full possession of all her faculties, about 4:30 in the afternoon of September 6th, accompanied by a girl of ten years, left the public road at a crossing and walked north on defendant's track, and at about one-quarter of a mile from the crossing was struck by defendant's train which approached from the south. The afternoon was clear, bright and warm, and plaintiff, bareheaded and carrying a lunch satchel and a box of wild haws, faced steadily to the north, and neither she nor the child at any time looked back or in any wise indicated a knowledge that a train was approaching from behind. At the time the defendant's train struck her the caboose of the other train was just opposite or had passed her 100 feet or so. The tracks were straight, unobstructed, and when defendant's train was a mile or a mile and a half from plaintiff and the child, the engineer saw them going north on the track, with their backs to him, and thereafter kept them under his eye, and also saw the train on the opposite track coming to meet his and that the trains would meet each other just about the time his train would overtake her. He sounded the signal at the crossing, which she did not seem to hear. According to his testimony when he was 600 or 700 feet from her, and according to other testimony when he was 180 to 200 feet behind her, he simultaneously began to sound the alarm signals and turned on the full force of the emergency air, but she at no time heard the train and did not know until after she had regained consciousness what had struck her. The train stopped after striking her, and its south end was sixty-eight feet north of the point of the accident, that is, the train ran 578 feet beyond that point, though some witnesses say the distance was eleven or twelve hundred feet. There was testimony that it could have been stopped in 300 or 400 feet, if it was then running at the rate the defendant's witnesses testified it was. The men on the train on the parallel road saw plaintiff's peril and did their best to draw her attention, by shouting and motioning, to the defendant's train bearing down upon her; but she supposed they were flirting with her, and at no time turned her head to look back. It is ad-

mitted that the train could not have been stopped after the alarm signals were first given before striking her. *Held,* first,. that a demurrer to the evidence should not have been sustained; second, whether or not the act of the engineer, with everything to be seen lying right under his eye, in allowing the situation to drift and delaying to attempt to stop the train until the near approach and noise of the train on the other track made it a matter of doubt whether or not the alarm signals would reach her and be effective, was the exercise of due care to avoid striking her, was a question for the jury, and their verdict holding his act to be negligent cannot be disturbed by the appellate court; and, third, there being a conflict in the testimony as to whether the train was 700 or 180 feet from her when the alarm signals were first sounded and the air brakes applied, that testimony also raised a question of diligence and care as to the time of giving the signals, which was for the jury.

*Held,* by WOODSON, J., dissenting, first, that there was no substantial testimony to contradict that of numerous witnesses that the danger signals were repeatedly given in ample time for plaintiff to have stepped from the track before being struck; second, that plaintiff unquestionably heard the danger signals, and that the engineer had the right to presume that plaintiff heard the signals and would step out of the danger line until he had reasonable ground to apprehend that she was ignorant of the train's approach and had not heard the signals; third, that plaintiff was guilty of the grossest negligence, which continued down to the place and instant of her injury, and therefore the humanitarian doctrine does not apply to the case, since the rule is that, if the negligence of plaintiff continues down to the time of the accident that doctrine has no application; fourth, since the engineer had a right to presume that plaintiff would heed the alarm signals which she heard or could have heard had she not been negligent in not trying to hear, and since it was impossible to have stopped the train before striking her after the signals were given, defendant is not to be held to have failed to exercise ordinary care in not sooner attempting to stop the train; and, fifth, even though it be conceded that defendant was guilty of negligence in not sooner stopping the train, yet as her own negligence continued down to the very instant she was struck, the concurrent negligence of both should bar her recovery.

8. **APPELLATE PRACTICE: Weight of Testimony: Matter for Jury.** The Supreme Court has nothing to do with the weight of testimony in a law case. Its function is to say whether there was any substantial testimony. It will not uphold a

verdict supported by only a mere glimmer or spark, a mere *scintilla*, of testimony; but if there is substantial testimony, however small as compared with the great body of proof, the appellate court has no right to meddle with the weight of it, or ignore it because negative in character.

9. ———: ———: ———: Negative Testimony: New Trial. Nor can the Supreme Court reverse a verdict for plaintiff though it rest alone upon testimony negative in character, if that testimony is substantial. Where the nineteen-year-old plaintiff was bareheaded and had good ears, yet neither she nor the ten-year-old child with her heard any alarm signal from the train approaching from behind, the appellate court will not say that the signals were sounded though several other witnesses, both interested and disinterested, positively testify they were sounded. The trial court, under such circumstances, might properly grant a new trial to defendant on the ground that the verdict was against the great weight of the credible testimony; but that negative testimony was substantial, and in the face of it the appellate court has no right to reverse a verdict for plaintiff, even if the failure to sound the alarm signals were the only issue of negligence in the case.

10. NEGLIGENCE: Pedestrian on Track: Failure to Stop Train: Depending on Alarm Signals: Confusion of Noises. A railroad engineer does not use due diligence in applying the emergency brakes, if a large train is passing on a near-by parallel track, making so much noise that the sounding of the alarm signals is drowned in its volume, and, depending on those signals to draw the attention of a trespasser on the track, he waits to apply the emergency brakes until it becomes impossible with the means at hand to stop the train before striking her. His duty, under such circumstances, is to stop before hitting her. And under the circumstances of this case the engineer knew or was bound to know, which amounts to the same thing, that he could not stop his train after he first applied his brakes before striking plaintiff.

11. ———: ———: Instruction: Reliance on Rumbling of Train to Give Notice. An instruction telling the jury that no warning signals were necessary until the engineer discovered that the trespasser on the track, within the sound zone of a much greater train on a near-by track, did not hear the rumbling of his train, was properly refused.

12. ———: ———: ———: Not Looking. An instruction which precludes a recovery by the trespasser because she walked leisurely down the track without turning her head, and this although the jury believe "no signal was given nor effort made to stop the train," should be refused. It is not the law of a case falling within the humanitarian doctrine.

13. ———: ———: ———: Due Care: What is Stopping and Signal Distance. An instruction declaring that an alarm signal at 600 feet from the pedestrian on the track was due care, and that the engineer was not required to stop the train when he came in stopping distance of her, was, under the circumstances of this case, properly refused. And so also was another instruction declaring as a matter of law that if the alarm signals and attempts to stop the train began 600 feet from plaintiff and continued until she was struck she could not recover, properly refused, for it invaded the right of the jury to determine what was due care under the peculiar circumstances of this case.

14. ———: ———: ———: Noise of Another Train: Not Looking Behind. An instruction telling the jury that it was the imperative duty of the pedestrian on the track, because of the great noise made by a train passing in the opposite direction on a near-by track, to look behind to see if the train that struck her was approaching, and if she failed in that duty she could not recover, was properly refused. In effect, it was a mandatory instruction for defendant.

15. ———: ———: ———: Wantonness: Humanity Rule. The court should not tell the jury in a case resting on the humanitarian rule that the railroad company owed no duty to a pedestrian walking on its track except to not willfully or wantonly injure her. The willfulness and wantonness doctrine is exploded. The touchstone of duty in the law of negligence is due care, not a shade less or more.

16. ———: ———: ———: Alarm Signals Not Heard for Noises. An instruction based on the theory that if the alarm signals were timely given but could not be heard because of the noises made by a train on another near-by track, the pedestrian could not recover for injuries received by being run down by the train, is not the law of a case resting on the humanitarian doctrine. Due care does not, because of the noises, exclude the duty to stop the train in time to avoid the injury.

17. ———: ———: ———: Limiting Distance for Signals. An instruction declaring the law to be that if the whistle was blown from three to six hundred feet from plaintiff as she walked on the defendant's railroad track with her back to the approaching train, and afterwards until she was struck, and the engineer did all in his power to save her after discovering she did not get off the track to avoid her own injury, then the verdict must be for defendant, under the circumstances of this case invaded the province of the jury, by limiting the distance in which the engineer was obliged to begin an effort

to warn and save plaintiff to within three to six hundred feet, and therefore was properly refused.

18. ———: Pleading: Noises of Another Train: Proof. The noises of a train on another near-by track, and the fact that any experienced person observing that train going in one direction and the one which struck defendant going in the other could see that the two would pass about the place plaintiff was struck, are evidential matters, and proof of them may be made under a charge of a failure to use due care, without pleading them as specifications of negligence.

19. ———: Trespasser: Instruction: No Duty Except to Sound Alarm. An instruction which excludes any duty of the engineer to a trespasser to stop the train under any circumstances is bad; and a modification by inserting the words "in the first instance" in the clause declaring that "the defendant owed to her no duty, in the first instance except to warn her by the usual signals of the approach of the train in time for her to step off the track and avoid being struck," was more favorable to defendant than it was entitled to, since under the testimony the situation demanded the instantaneous application of the air brakes with the blowing of the whistle.

20. ———: Excessive Verdict: $10,000. Plaintiff, nineteen years old, a school teacher, while walking on a railroad track, was struck by a train. She was taken up unconscious, remained unconscious for days, was injured on her head, an arm and leg were broken, she was disfigured, one of her feet and the toes of that foot are drawn out of place, making her club-footed and lame, one arm is crooked and there is a catch in the elbow of it, and she is a cripple for life. *Held*, that a verdict for $10,000 is not excessive.

21. REMARKS OF COUNSEL: Reasonable Verdict, etc. The straying by plaintiff's counsel in the heat of argument a little out of the record, for which he was admonished by the court, in a case which is not a close one, in which the size of the verdict does not show inflamed minds in the jurors, will not justify a reversal or a new trial.

Appeal from Adair Circuit Court.—*Hon. Nat M. Shelton,* Judge.

AFFIRMED.

*James L. Minnis* and *Higbee & Mills* for appellant.

1. The court erred in overruling defendant's demurrer at the close of all the evidence.  a. It was admitted by plaintiff's counsel on the trial that defendant's track was inclosed by lawful fences and cattleguards; there was no evidence tending to prove that the track was used by pedestrians as a public highway; or that defendant acquiesced in occasional use of it by pedestrians; the court so found and declared by defendant's instruction 13, and that plaintiff was a trespasser by defendant's instruction 14.  No exceptions were saved thereto; plaintiff agreed to the correctness of both instructions. Eppstein v. Railroad, 197 Mo. 720; Frye v. Railroad, 200 Mo. 402; Hyde v. Railroad, 110 Mo. 272; 2 Thomp. Neg., sec. 1705.  b. The petition charges that defendant's servants in charge of the train negligently failed to warn plaintiff of the approach of the engine, or to sound the whistle or ring the bell at any time within one-fourth mile of her, or to use ordinary care to stop the train.  These are the specific allegations of negligence, and are alleged to have been the cause of plaintiff's injury. There was a total failure of proof of these allegations, and the case should have been withdrawn from the jury.  McManamee v. Railroad, 135 Mo 440.  Collins, the peddler, plaintiff's witness, testified danger signals were given until plaintiff was struck, but he did not know which engine gave them; the Katy train passed between him and the Wabash train, and he had no opportunity to observe when the train began checking its speed; his evidence on that point was without probative value.  Bennett v. Railroad, 122 Mo. App. 703.  c. The evidence was conclusive that plaintiff was guilty of gross negligence continuing down to the time of the accident; that she knew she was walking on defendant's main track; that it was broad day-

light, the view unobstructed, and she at no time looked behind her or listened for the approach of a train. She was not only apparently, but in fact, in possession of all her faculties. The engineer had no reason to believe she would not hear the alarms and was not bound to anticipate she would not step aside. Her negligence, according to her own testimony, was unaccountably gross, was subsequent to the alleged negligence of defendant's engineer, continued down to the time of the accident, and was the proximate cause thereof. She had the last clear chance to avoid the injury. 23 Am. & Eng. Ency. Law (2 Ed.), 761, 765; 1 Thomp. Neg. 235-241; Bogan v. Railroad, 129 N. C. 154; 3 Elliott on Railroads, secs. 1253, 1254, 1257a; Davies v. Mann, 10 M. & W. 546; Drown v. Traction Co. (Ohio), 10 L. R. A. (N. S.) 421; Dyerson v. Railroad (Kan.), 7 L. R. A. (N. S.) 132, and annotations; Modiwell v. Railroad, 151 Fed. 421; Neal v. Railroad, 49 L. R. A. 684; Hoffard v. Railroad, 110 N. W. 446; Copp v. Railroad, 100 Me. 568; Williams v. Railroad, 40 So. (Ga.) 143; Finlayson v. Railroad, 1 Dill. 578; Holmes v. Railroad, 97 Cal. 161; Railroad v. Graham, 46 Ind. 239; Railroad v. McClaren, 62 Ind. 566; Railroad v. Walker, 113 Ind. 196; Campbell v. Railroad, 55 Kan. 536; Syme v. Railroad, 113 N. C. 558; Railroad v. Cook, 42 Neb. 905; Herring v. Railroad, 32 N. C. 402; McAdoo v. Railroad, 105 N. C. 140; Daily v. Railroad, 106 N. C. 301; Norwood v. Railroad, 111 N. C. 236; Cogswell v. Railroad, 6 Ore. 417; Tyler v. Sites, 90 Va. 539; Railroad v. Judd, 10 Ind. App. 213. (d) It was plaintiff's duty to have given attention, heard the signals and left the track. It was her misfortune if she was so absorbed she failed to take notice of the repeated warnings. By subsequently continuing to walk on the track until she was struck she was guilty of such contributory negligence as to defeat her recovery in this cause. Her negligence was the proxi-

241 Sup.—10

mate cause of her injury, although the engineer might have been negligent in not stopping the train in time to avoid the collision. Yarnall v. Railroad, 75 Mo. 575; Sinclair v. Railroad, 133 Mo. 233; Prewitt v. Eddy, 115 Mo. 283; Woods v. Railroad, 188 Mo. 229; Candee v. Railroad, 130 Mo. 142; Bell v. Railroad, 72 Mo. 50; Maloy v. Railroad, 84 Mo. 275; Sharp v. Railroad, 161 Mo. 214; Tanner v. Railroad, 161 Mo. 497; Barker v. Railroad, 98 Mo. 50; Powell v. Railroad, 76 Mo. 80; Everett v. Railroad, 214 Mo. 54; Dlauhi v. Railroad, 105 Mo. 645; McGauley v. Railroad, 179 Mo. 583; Brockschmidt v. Railroad, 205 Mo. 435; Cahill v. Railroad, 205 Mo. 393; Laun v. Railroad, 216 Mo. 563; Zumault v. Railroad, 175 Mo. 288; Ross v. Railroad, 132 Mo. App. 472; Sims v. Railroad, 116 Mo. App. 572; Bennett v. Railroad, 122 Mo. App. 703; Reyburn v. Railroad, 187 Mo. 565; Engelking v. Railroad, 187 Mo. 158; Schmidt v. Railroad, 191 Mo. 215; Eppstein v. Railroad, 197 Mo. 720; Stotler v. Railroad, 204 Mo. 619; Sissell v. Railroad, 214 Mo. 515; Holland v. Railroad, 210 Mo. 338; Davies v. Railroad, 159 Mo. 1; McGee v. Railroad, 214 Mo. 530; Kinlen v. Railroad, 216 Mo. 145; Felver v. Railroad, 216 Mo. 195. (2) The doctrine of the last clear chance means a clear opportunity, and not a mere possibility. The court submitted the case upon mere estimates or guesses of distances, speed of the train, formed under the excitement of the impending catastrophe, and of the distance within which the train could have been stopped. The fact remains that danger signals were given, the full force of the brake power applied, the track sanded, and the bell rung continually for a distance of near 600 feet before plaintiff was struck, and the train did not stop in time to save plaintiff, and every one but herself was exhausting his utmost efforts to avoid the collision. It cannot be said there is any evidence of such gross negligence or reckless or wanton conduct as justified the court in submitting to the jury to say

whether or not the plaintiff ought to recover in spite of her own negligence. It requires more than a showing of a mere possibility that the accident might have been avoided in order to bring a case within the humanitarian doctrine. Markowitz v. Railroad, 186 Mo. 350; Boring v. Railroad, 194 Mo. 541; Neal v. Railroad, 126 N. C. 634.

*Sanford B. Ladd, F. M. Harrington* and *Campbell & Ellison* for respondent.

(1) Although plaintiff was negligent and a trespasser, this fact will not bar her recovery, because it stands admitted defendant's operatives saw her in ample time to stop the train. Morgan v. Railroad, 159 Mo. 262; Eppstein v. Railroad, 197 Mo. 720. In fact in cases based on the humanitarian rule the negligence of the plaintiff is confessed. Hall v. Railroad, 219 Mo. 553; Everett v. Railroad, 214 Mo. 54. (2) Defendant presents a demurrer at the close of plaintiff's case and again at the close of all the evidence. The whole evidence is before the court. "It is elementary in this State that a demurrer admits every fact to be true which the evidence in the case tends to prove, whether by direct testimony or by reasonable deductions to be drawn therefrom." Von Trebra v. Railroad, 209 Mo. 658. (3) It is claimed by appellant that plaintiff's evidence that she did not hear alarms is of no probative force, and does not tend to prove alarms were not sounded. There might be force in this contention if alarm signals were ordinary noises and if other circumstances existing in this case were not also proven. But alarm signals from an engine are startling noises and are heard for miles. It is impossible for us to conceive of persons being so absorbed they would not hear such signals sounded within a few hundred feet of them. Plaintiff is not the only one who did not hear. The little, timid, nine-year-old child

that walked on the ends of the ties and who escaped so narrowly that even the fireman and brakeman on the Wabash train told the conductor that she, too, had been struck, evidently did not hear any alarms. Her conduct in remaining on the track is a mute but convincing witness that she did not hear. That little girl had not reached the age to be "mentally absorbed." The passing train on the M., K. & T. track was only sufficient to prevent her hearing the ordinary noises of the approaching Wabash train. If alarm signals had been sounded continuously for six hundred feet before it reached her, as appellant contends, she, as well as plaintiff, would undoubtedly have heard. There would have been near fifty short, sharp, startling shrieks in that six hundred feet and almost one-half minute would have been required by the train in traveling the distance. That they did not hear such extraordinary noises is strong evidence there were no such noises. Even plaintiff's evidence that she did not hear is of itself sufficient to submit the question of alarms or no alarms to the jury. Murray v. Company, 101 Mo. 242; Hanlon v. Company, 104 Mo. 388; State v. Company, 70 Mo. App. 641. (4) The defendant's answer avers that defendant failed to stop, look or listen for the approach of defendant's said cars; that as soon as her presence on said track was discovered by defendant's employees so managing and operating said train, she was duly warned of the approach by said train by blowing the whistle and ringing the bell. Said averment is, as a matter of law, a confession on the part of defendant that plaintiff was in peril at all times while on said track. Lynch v. Railroad, 208 Mo. 24. There is no claim in the answer that any efforts whatever were made by said operatives to stop or check the train; on the contrary, it proceeds upon the theory that the only duty defendants operatives ever owed plaintiff was to sound the whistle. The question as to when the defendant did or

ought to have discovered plaintiff's peril is well stated in Becker v. Company, 53 L. R. A. 270.

LAMM, J.—Negligence. Defendant in apt time and due form appeals from a judgment in the Adair Circuit Court entered on a verdict in plaintiff's favor for $10,000.

The pleadings. As we construe the petition it counts on the three specifications of negligence following:

First, that plaintiff was walking on defendant's track in Randolph county south of the city of Moberly at a point where said track (with the knowledge of defendant and its officers, servants and employees) was for a long time treated as a thorougfare by people not connected with the railroad service and by them was traveled as a public highway of said county. That such public user cast the duty upon defendant's employees running its trains to keep a sharp lookout for persons on the track in front of them and exposed to danger. That on the occasion in hand defendant's employees running a certain locomotive and train of cars failed to perform this duty, when by ordinary care in looking out they would have discovered plaintiff's peril in time to have saved her. (*Nota bene*: This specification was not submitted to the jury.)

Second, complaint is made in the petition of a negligent rate of speed of forty miles an hour in violation of defendant's alleged duty to run its trains at the *locus in quo* at such speed as permitted the engineer to have his train "constantly under control." (*Nota bene*: This specification also was not submitted to the jury.)

Third, finally the petition counts on another theory, viz., that, plaintiff being on the track and unconscious of the train's approach, defendant's servants in immediate charge of its locomotive and train saw her danger in ample time to have warned her and to

have stopped the train before running her down and negligently failed to do either, whereby she was run down, struck and injured. (Note. This was the issue put to the jury upon which to predicate a recovery.)

The answer admits defendant was a railroad corporation owning and operating the line of railroad mentioned, but denies all other allegations. Following that denial is a plea of contributory negligence—in that, the place of the accident was in the country among farms, where defendant's track was inclosed by side fences and cattle-guards and was not at the crossing at any public road; that plaintiff, without the knowledge or consent of defendant or its employees managing its train, negligently got upon its track as a trespasser and, walking thereon, negligently failed to stop, look or listen for the train. That as soon as she was seen on the track by defendant's said servants she was duly warned by both whistle and bell, notwithstanding which warnings she failed to leave the track as she had plenty of time to do. That if she had stopped, looked or listened she would have seen and heard the train in ample time to leave the track and avoid her own injury; wherefore, defendant avers that plaintiff's hurts were caused by her own negligent, unlawful and careless conduct. While, as said, defendant, in its answer pleaded affirmatively that due care was exercised in giving warnings by signals, there is no affirmative plea of any attempt to stop before hitting plaintiff. The issue in that behalf was raised by the general denial.

The cause was argued twice at our bar—once in Division and once in Banc. The force of the oral arguments by learned counsel on both sides was spent on the alleged error of the ruling *nisi* disallowing a demurrer to the evidence at the close of the whole case. So, error in that ruling is pressed with vigor as the main assignment in defendant's brief.

There are other assignments, viz.:

The court erred (1) in giving plaintiff's first and second instructions; (2) in refusing eleven instructions prayed by defendant; (3) in permitting evidence tending to prove that plaintiff's attention was attracted by the noise of an M. K. & T. train running nearby on a parallel track; (4) in modifying defendant's 15th instruction; (5) in overruling defendant's timely objection to the inflammatory argument of plaintiff's counsel and in failing to rebuke counsel; and (6) finally that the verdict was against the instructions, was excessive and the product of sympathy, prejudice and passion.

Attending to those assignments, the main one seeks the facts, which are, to-wit: _

It is not amiss to cull, as near as may be, the undisputed from the disputed facts. Those undisputed follow, viz.: The scene of the accident was a mile or so south of the town of Moberly. Close by its south corporation line the Missouri, Kansas and Texas crosses the Wabash. Thence south for two or three miles the tracks of both run on a tangent and parallel 100 feet apart, the Wabash to the east, and the rights of way of both are inclosed by the same side fences and cut off by cattle-guards at public crossings.

Going north into Moberly there is an up grade of twenty-seven feet to the mile at the place of the accident, but the view on and of each track is quite unobstructed for a mile and a half or more either way from that place. At that point the Wabash track lay on a fill.

Some two or three hundred feet north of that place an east-and-west public road cuts both railroad tracks at a right angle, making what is called the Headinghouse crossing. About one-half mile south of the Headinghouse crossing there was another east-and-west public road making what is called the Terrill crossing.

There was a school house at a cross-road corner west of the Terrill crossing. Miss Dutcher began teaching school in that country schoolhouse four days before she was injured, to-wit, on the 6th day of September, 1906. She boarded with her brother, who lived on a farm northeast of the Headinghouse crossing on a north-and-south public road. She could go home from school by public roads in two ways. First, she could turn north at the corner at the schoolhouse on a public road and after aways turn east and go on over the Headinghouse crossing, and thence on east until she came to the north-and-south road on which her brother lived, and thence north on that road home; or she could go straight east from her schoolhouse on the Terrill road, cross both tracks at the Terrill crossing, thence on east till she came to the road on which her brother lived, thence turn north home, missing the Headinghouse crossing altogether.

She took neither of these ways home on the day she was hurt, nor had she taken either in the four days of her school term. She went (as she always had gone) east on the Terrill road until she came to or close to the Terrill crossing and then she turned north taking the M. K. & T. track for it. Presently, for personal reasons immaterial here, she changed over from the M. K. & T. to the Wabash and traveled north on the latter's track for, say, a quarter of a mile, heading toward the Headinghouse crossing, where she planned to turn east until she came to the road on which her brother lived. It was about 4:30 of a clear, warm, bright summer afternoon. Taking with her a pupil, a little girl of ten years, she (herself aged nineteen) walked north in the middle of the track, bareheaded, carrying a lunch satchel and a box of wild haws, and being at the time in full possession of perfect natural senses. It seems the child walked a trifle ahead and to one side outside the rail on the ties, but within the danger line. The testimony is that after

starting north neither of them turned their heads to look for a train from the south, but faced steadily to the north. However, when Miss Dutcher first got upon the Wabash track she looked to the south, but no train was then in sight.

A few minutes before the accident, a train on one track was approaching one running on the other. On the M. K. & T. track there was a heavy freight train of 1000 or more feet in length, made up of twenty-five loaded cars, running down grade to the south at, say, 20 miles per hour and making a great deal of noise. On the Wabash track there was a train of, say, 510 feet in length, made up of twelve loaded freight cars, running extra, approaching her from the south at a speed of from twenty-five to thirty miles per hour. The eight forward cars of this train and the engine were well equipped with air—the last four, including the caboose, were non-air cars.

When a mile or a mile and a half away (and constantly thereafter until he struck her) the engineer of the Wabash train saw the school mistress and little child going north on the track ahead of him, with their backs to him, and kept them under his eye. He also saw the M. K. & T. train coming to meet his. A man of experience, such as the Wabash engineer was, could well conclude, as appears from the testimony, that at the rate the two trains were running the Wabash train would catch up with the school mistress at the very time the M. K. & T. train would pass her only 100 feet to her left. This would become more and more obvious as the trains covered the distance between them. That was precisely what happened. At two or three hundred feet south of the Headinghouse crossing, when the caboose of the M. K. & T. train was passing her or had got by her a hundred feet or so, the locomotive of the Wabash train struck her and tossed her many feet up and to one side off the track.

The child was not injured—the record being dark on the reason why.

It does not appear which way the wind, if any, blew and train sounds carried. Although bareheaded and in possession of all her natural senses, as said, Miss Dutcher did not hear the train that struck her nor did she know what struck her, and the evidence of the several eye witnesses is to the effect that as that train approached her from behind she walked straight on in the middle of the track, giving not the least sign she was aware of its approach, but to the contrary showing by her carriage and conduct that she was entirely oblivious to its presence.

She was taken up unconscious, remained unconscious for days, was injured on her head, an arm and leg were broken and possibly both arms, she was disfigured, one of her feet and the toes of that foot are drawn out of place, making her clubfooted and lame, one arm is crooked, there is a catch in the elbow of it, and there are other serious injuries—in short she is a cripple for life.

The M. K. & T. train was, as said, over 1000 feet long. As the men on the engine of that train approached her they saw her and apprehended her ignorance of danger and imminent peril and did their best to attract her attention to the Wabash train bearing down upon her from behind by shouting and motioning. At the same time at the rear of the M. K. & T. train the men on the caboose also saw her peril and that she was unaware of it and also tried to warn her by shouting and gesticulating until they passed her. She saw this train and the motions of these men but, misapprehending their meaning, she thought they were trying to flirt with her and went her way in the middle of the track with her face, as always before, set to the north.

There was a whistling post eighty rods south of the Headinghouse crossing. All sides agree that the

Wabash engine gave the usual crossing signal at that post. I am of opinion that the fact, or if not the fact, at least the time and extent of the alarm signals, if any, belong in the list of disputed or uncertain facts to be stated later on.

We shall assume it proved beyond question that at the instant the school mistress was struck the Wabash engine had slowed down some—the extent thereof and the time and character of attempts to stop belong also in the category of disputed or uncertain facts to be noticed later on. After she was struck the Wabash train stopped, but before stopping it ran so far that its caboose stood about two carlengths (say sixty-eight feet) north of where her body lay in the ditch. That is, it ran its own length (about five hundred and ten feet) plus sixty-eight feet. She was struck about 300 feet south of the Headinghouse crossing. The day was warm, as said, and the windows of the Wabash caboose and of its cupola were open. A brakeman, in order to make a quick switch at Moberly, had gone forward over the Wabash engine to the cowcatcher. He shouted to the school mistress as the engine came on, and, seeing she was unconscious of the warning and that the engine was bound to strike her, he left his post and came back over the engine before that event.

All the testimony tends to show that plaintiff was a trespasser on the Wabash track and that the sporadic occasional use of the track by footmen did not establish any public right by custom, acquiesced in, to such user at the time and place.

It maybe taken as established, also, that when the air brakes were once applied the jar of the air going on would be felt immediately in the non-air cars at the tail of the train. Moreover that, speed and track both considered, it was impossible to stop after the air was actually applied before hitting plaintiff, leaving the

question open for the nonce whether the application of the air was negligently delayed.

We now come to a set of facts which are uncertain or disputed, or from which different inferences are drawn by counsel. As the summary we are making relates to defendant's demurrer to the evidence, we shall deal with the disputed and uncertain facts in a way as favorable to plaintiff as the record will allow —laying to one side, as within the province of the jury, both self-contradictions of, and disagreements between, witnesses; and giving our impressions of the tendency of the proof based on a critical study of the record, rather than swell the statement by profusion of detail.

There is some evidence to the effect that a rain had lately fallen and the public roads were heavy, and much that there was a dry spell and those roads were dusty; but, as this testimony connects itself merely with the use of the track by pedestrians, we lay it out of view on the same shelf with the user itself.

By far the greater weight of the testimony tends to show that alarm signals were given by the Wabash engineer before the school mistress was struck. Some of it indicates they commenced at once after the crossing signal at the whistling post, say, 800 or more feet away from plaintiff. Some of it is to the effect that these signals commenced subsequently when the Wabash engine was 600 feet south of plaintiff. The engineer so testified. His account is that, noticing that the school mistress and the little girl did not look around when he gave the crossing signal, he drove ahead until within about 600 feet of where plaintiff was struck, when he began giving danger signals and continued them until she was struck. She was, as already said, always under his eye and he saw she gave no indications that she heard the signals or the train but just walked on in a leisurely sort of gait. But there was other testimony from some of defendant's

witnesses who were watching the train, the school mistress and little girl, which is fairly susceptible to the construction that the alarm signals were first given when the engine was about one hundred and eighty or two hundred feet from the school mistress. There was an eye witness (Collins) on the M. K. & T. track 175 feet north of the Headinghouse crossing who left the track to let that train pass. There is some uncertainty whether he left to the east or to the west. If to the west, then the M. K. & T. train passed between him and the scene of the accident and shut off his view for the time. If to the east, then he was in plain view all the time. However, when the M. K. & T. passed him he could see what happened. He testified that the sharp alarm blasts were given after the M. K. & T train passed him (but by which train he did not know) and he must have stood about four hundred feet from the point where she was struck.

There was negative evidence of some appreciable value. For instance, as pointed out, the school mistress was bareheaded and had good ears and she heard no alarm signals at all from the Wabash train. A silent fact of some value is that the child seems to have heard no alarm signals either. So, the Wabash conductor who was 510 feet from the nose of the engine of his train and was in a caboose with open windows, says he heard no alarm whistling until a while after he felt the jar and jam of his train from the air going on. A brakesman, in the cupola and similarly situated, gave evidence to the same effect. There was some testimony that the alarm signals continued after she was struck and one witness who was watching (Collins) says he saw no steam escape from the Wabash whistle.

Another witness testified the alarm signals were given after the M. K. & T. train passed south over the Headinghouse crossing. On that hypothesis they were given much less than 600 feet from her. So much for

the fact of alarm signals and the time they were given.

What of attempts, if any, to stop the train and when were they made? The engineer says that, *simultaneously* with giving the alarm signals when 600 feet away from the plaintiff, he turned on the full force of his air and that his efforts to stop resulted in lowering his speed to about sixteen or eighteen miles per hour. Other testimony cuts the speed down to from ten to fifteen miles per hour at the moment of impact. Some of the testimony tended to show that the emergency air was turned on *before* and some of it *after* the alarm signals were first given, and some of it, not agreeing to the distance mentioned by the engineer, tended to show (as he testified) that the air went on at the same time the alarm signals were given. There was also testimony tending to show that the train ran after the emergency was applied eleven or twelve hundred feet and that the stop was a good one (this from the engineer and others), but there was other testimony tending to show that the train only ran from 600 to 800 feet after the emergency air went on. Assuming the train was running at the time it struck her at twelve to sixteen miles per hour, there was testimony tending to show that at twelve miles per hour, it could stop in 300 feet and at sixteen miles in 400 feet. In point of fact it ran after the blow about 600 feet. The witness Collins testified there was no slacking of speed at all until after Miss Dutcher was struck.

If necessity arises other facts will be stated in connection with the disposition of the assignments of error *seriatim*.

I. When this case was argued in Division, the three sitting brethren were at first of opinion the demurrer to the evidence was improvidently ruled. But a restudy of the record, aided by arguments in Banc and new briefs, warrants a holding that the demurrer was well ruled. This because:

(a)  Defendant's counsel industriously (and *ex industria*) have marshaled a great array of authority which we take as intended to explode the humanity rule as broadly expounded and adhered to in this jurisdiction.  Thus, based on the theory that plaintiff was a trespasser and walked for a quarter of a mile on defendant's track without looking behind her for a train, it is contended she was guilty of such palpable contributory negligence as defeats recovery *as a matter of law,* regardless of defendant's own negligence. But we will not be drawn into an extended exposition of the philosophy of the humanity rule nor into a fresh defence of it.

In Reyburn v. Railroad, 187 Mo. 1. c. 574, we said: "If what this court has said in former cases has failed to reconcile appellant to the justness of this doctrine probably nothing we could now say would be more persuasive." That language was addressed to an attack made upon the humanity rule as laid down in the same case in these words (pp. 573-4): "It has long been the doctrine of this court that though a man voluntarily adopts the dangerous track of a railroad for his footpath and walks in it apparently heedless of the danger entailed, yet if the servants in charge of the locomotive see him and realize his danger, . . .  it then becomes their duty to exercise ordinary care to do what they can with the means then at hand to avoid injuring him, and if they fail in that duty the railroad company is liable, notwithstanding the negligence of the injured man."

In the Murphy case (228 Mo. 56) an elaborate and animated assault—one of many before—was delivered in Banc on the rule.  In response we said, *inter alia* (p. 80): "In the light of our later decisions, holding a single and no uncertain voice in that behalf, to defend the rule by marshaling anew the reasons underlying it, is but to admit it needs defense, and we leave it with some observations, viz.:  (1) It is

too firmly rooted in the jurisprudence of this State to be overturned by anything short of an act of the law-making power.''

In Banc in the Eppstein case, 197 Mo. l. c. 733, certain propositions pertaining to the humanity doctrine were formulated. Two of them are: ''(a) Where one (at least one *sui juris*) is in a place of safety and therefrom negligently moves to a place of danger, so immediately before that danger that it may not be averted by the use of ordinary care by those controlling the dangerous instrumentality, and is killed, his death is not actionable. (b) Where one, unconscious of his peril, has negligently placed himself in a position of danger so far away from that danger that his death may be averted by the use of ordinary care by those who see him and who control the dangerous instrumentality, his death is actionable.''

In peril oft may be, yet so stands today the rule of law administered by appellate courts of Missouri in negligence cases coming within the range of the rule. *Stare decisis. Quieta non movere.* Accordingly the demurrer to the evidence cannot stand on the unsoundness of the humanitarian doctrine.

(b) A locomotive engine is equipped with whistle, bell and ability to stop its train. When one is negligently upon a railroad track unconscious of his immediate peril and that peril is timely discovered by those in charge of the engine they may not punish him for his negligence by knocking him off and thereby killing him, or breaking his bones or mauling and smashing his body. Out of tenderness to life and limb they must do what every man must do for every other man, in times of peace, viz., use due care to preserve life and limb. Due care is care according to circumstance. Due care calls for the use of the means at hand to prevent one's injury to the person timely seen exposed to danger. The means at hand in this instance were bell, whistle and ability to stop. In some cases, the monoto-

nous stroke of the bell might be due care. In others, easily put, the alarm whistle timely used might be due care. And (the gauge of duty arising precisely with the obvious danger and the circumstances attending the individual case, under the axiom "the greater the hazard the greater the care"—*per* VALLIANT, J., in Woods v. Railroad, 188 Mo. 229) in some extreme cases nothing short of stopping would be due care. Because plaintiff was a trespasser those of defendant's servants in charge of its locomotive were under no duty to look out for her in the country away from congested populations and between public crossings, absent a known and permitted public user, as here. But in this case they saw her a great ways off and saw her peril. Barring the duty to look for trespassers, the duty to use due care not to kill or maim them if they are seen in time, is precisely the duty owed to those not trespassers.

In Lynch v. Railroad, 208 Mo. l. c. 34, it was ruled: "But even if he (deceased) had been guilty of contributory negligence, running as he was for a half mile or two-thirds of a mile in plain view of the engineer and fireman on this engine and having indicated in no way to them his knowledge of their approach, it was their plain and obvious duty to exercise reasonable care for his safety and not run over him. From the time they saw him and observed, as alleged in the defendant's answer, that he was not looking back and was ignorant of their approach, it was their duty to warn him and to slow down the train *and stop if necessary in order to save his life.*"

The Chamberlain case was in Banc (133 Mo. 587). In discussing the Sinclair case (133 Mo. 233) and the Reardon case (114 Mo. 405) we considered an instruction in the Chamberlain case, which, among other things, told the jury that, if Chamberlain (quoting) "while walking upon defendant's track, became in

241 Sup.—11

imminent peril of being struck by defendant's train, and defendant's employees in charge of said train became aware of his peril of being struck in time to have enabled them, by the exercise of ordinary care, to have stopped said train, and to have averted the injury to said deceased, . . . and that they failed to exercise such care and stop said train, and that by reason of such failure to exercise such ordinary care, the said train was not stopped and said Chamberlain was struck and killed, then the jury must find for the plaintiff, though the jury may find that the deceased, Godfrey Chamberlain, was guilty of negligence in walking on defendant's track.'' In speaking to that instruction and approving it we said (p. 605): ''But the instruction would not be proper in all cases, as the signal if given in time would be all that was required to apprise a trespasser, *until it is seen he apparently does not hear it. The engineer is not required to stop his train* if the trespasser is far enough away to warn him, and a timely warning is sufficient *until it is seen that for some cause it is not heeded; then it is his duty to avoid killing, even a trespasser, if by the exercise of ordinary care it can be done.*''

The sound general doctrine is thus summarized and formulated in an excellent treatise (2 Shear. and Red. on Neg., sections 483-4): ''The rule stated in section 99, that the plaintiff may recover, notwithstanding his contributory negligence, if the defendant, after becoming chargeable with notice of the plaintiff's danger failed to use ordinary care to avoid injuring him, has been enforced in many railroad cases. It is universally agreed that this rule applies to all cases in which the defendant or his agent is actually aware of the plaintiff's danger. Thus, a locomotive engineer or motorman, after becoming aware of the presence of any person on, or dangerously near the track, however imprudently or wrongfully, is bound to use as much care to avoid injury to him as he ought

Dutcher v. Railroad.

to use in favor of one lawfully and properly upon the track, that is to say, ordinary care with respect to anticipating injury, before it becomes imminent, and the utmost care and diligence of which he is personally capable, after he knows that it is imminent. He must promptly use all the usual signals to warn the trespasser of danger, and he must also check the speed of his train, and even bring it to full stop, if necessary, unless the circumstances are such as to justify him, acting prudently, in believing that the traveler sees or hears the train and will step off the track in ample time to avoid all danger, without any diminution of the speed of the train. . . . In general, an engineer has the right to assume that a person walking upon the track is free to act, and is in possession of all ordinary faculties, and will therefore act with ordinary prudence; but when the conduct of the traveler is such as to excite a doubt of this, the engineer is bound to use greater caution, and to check or even stop the train, as may be necessary. So, where he sees a little child upon the track, he has no right to assume that the child will use the same discretion for its own protection as an older person would; and he must bring the speed of the train under control as quickly as possible, so as to be able to stop it altogether, if the child does not appreciate its danger. . . . The rule stated in the last secton, however, does not cover the whole ground. The defendant is responsible, not only for what he actually knows, but for that which he is bound to know. It is clear that the frequent statements that contributory negligence is an absolute bar to recovery, except where the defendant's conduct has been 'reckless,' 'willful' or 'wanton,' or even grossly negligent, are not sound. No courts have in actual practice adhered to this imaginary rule; it has been explicitly overruled, and, indeed, it has been explained away or disavowed by courts which have previously stated it. Nothing more

is really meant by the courts using these phrases than a want of ordinary care, after becoming actually aware of the plaintiff's peril."

Assuming that due care may embrace the duty to give alarm signals in some cases, and the further duty, when those alarm signals fail (or apparently will fail) of their purpose, to stop the train, it remains to inquire: When does either duty arise? Attend to what we have ruled on that score: "It may be safely said as a general rule that the duty of care arises in all cases as soon as the perilous situation of the trespasser is discovered"—per MACFARLANE, J., speaking for the whole court, in the Sinclair case supra. Still further speaking to the point, he said (p. 242): "From these cases, and many others that might be cited, it seems to be well settled that *where no conditions intervene to confuse, or to prevent hearing a signal, and knowing its object,* it will be sufficient if given in time for the trespasser to leave the track safely." Speaking to the duty to stop the train we in that case further ruled that "this duty of the engineer arose as soon as he knew, *or by proper care ought to have known,* that deceased did not regard the warning signal."

And in a late case in Banc, Degonia v. Railroad, 224 Mo. l. c. 595, there is guarded general language by our Brother GRAVES apposite here, viz.: "Plaintiff's case therefore must proceed upon the theory that defendant's servants saw the perilous position of the deceased, and *saw such things* as would lead prudent persons to believe that deceased was oblivious to such perilous position, and after so seeing had time to obviate and avoid the accident by ordinary care and caution upon their part. It devolved upon the plaintiff to show these facts."

Justice is the constant and perpetual desire to give to every one his due, says Coke. It is not strange, then, that in a court of justice the just rule should be (as it

is in cases of this character) that when conditions intervene to confuse or prevent hearing an alarm signal or knowing its object, or where the conduct and actions of a party walking on a track with his back to a coming locomotive and a train of cars, should cause an engineer of ordinary prudence to conclude that such party did not or could not hear alarm signals and was continuing his walk on the track, the right of the engineer to act upon the presumption that he would leave the track before being hit ceases. Take an example by way of illustration. There is a working presumption indulged that a party approaching a street car track will stop and not step upon it in front of a going car, but that presumption ceases when by the actions and conduct of the traveler it would be apparent to a prudent motorman that he does intend to go upon the track (Ellis v. Railway, 234 Mo. l. c. 680-1 and cases cited). We can see no difference in principle between the two propositions. Both of them run on the theory that the party in charge of the car or locomotive should act on reasonable appearances and exercise due care in giving signals or in stopping.

Care to be *due* requires that alarm signals be given when they would be effective. And due care required that the attempt to stop should be made, as a last resort, when it would be effective; for if defendant owed any duty to stop at all that duty must begin when it amounts to something worth while. It must not be pretermitted until it amounts to nothing whatever. Any other view is hollow mummery—mere "words, words" that "lose the name of action." Again, speaking of due diligence or care, it is axiomatic that he who has at his disposal the means of knowing, is held to know; that he who shuts his eyes when to open them and look is to see, is held to see; that where there is a duty to use diligence, those facts which diligence will discover are presumed to be known under the law of notice; and that what one knows and

what he ought to know is regarded in law as equivalent. These trueisms are more often invoked in negligence cases against a plaintiff, but where the boot is on the other foot and defendant is charged with a duty to use due care, as here, they fill a very useful office in determining the scope and discerning the elements of defendant's duty.

We come now to apply more closely the general principles announced to the facts of the case at bar.

The engineer of the Wabash train gave his alarm signals, under some of the evidence, at about the time the M. K. & T. engine was opposite or nearly opposite the school mistress and child, to their left 100 feet. He continued them while that engine and long, heavy train thundered past her. We think he is charged with the duty to see and know that intervening conditions had arisen likely to confuse and prevent her hearing those signals. At least that was a question for the jury. He was charged with the duty to know and realize further that her actions unmistakably indicated she had not heard the crossing signals behind her. Whatever a man who knew of an approaching train might do in remaining dangerously long on the track, this engineer had no right to assume that the young school mistress and little girl, both presumably armed with the quick ear of youth, timid and shrinking from danger, were trifling with death by remaining on the track after they heard the crossing signals behind them. It is not natural for a woman and child to act that way. Natural instincts are allowed to have their weight and constitute evidence to men of sense. [Stotler v. Railroad, 200 Mo. l. c. 146.] Moreover, the situation, before a finger was lifted, had been allowed to drift and become so crying that the engineer concluded the emergency air should go on simultaneously with his giving the alarm signals. Is that the usual course? According to his theory, with everything to be seen lying right under

his eye, he drove ahead for 600 or 700 feet after giving the crossing before giving the alarm signals. In other words he waited until the deafening noise from the near approach and passage of the M. K. & T. train would naturally, according to the physics of the matter, make it a matter of doubt whether the alarm signals would reach her and be effective. At least there was a question for the jury on that point and they were entitled to take that view of it. Moreover, there was testimony strongly tending to show that the engineer was mistaken about the distance. There is testimony that it was less than 600 feet, and some of it indicated he was as close to her as 180 or 200 feet. Such testimony raised an issue for the jury on the question of diligence and care in the *time* of giving the signals. Again, while the broad current of the testimony ran the other way, yet there was testimony of some value, negative in character, from which the jury might infer no alarm signals were given at all. There were silent facts, of which it may be said, though silent, they cry out (*dum tacent, clamant*), squinting the same way. We lay little stress on this feature of the case. We think if that had been the sole issue and the jury had found for plaintiff the duty of the trial court would have been to set the verdict aside as against the very great weight of the credible testimony. But when a case at law comes by appeal to this court, we have nothing to do with the weight of the testimony. The appellate function is to say whether there is any substantial testimony. A mere glimmer or spark, a mere *scintilla* will not do, but if there is substantial testimony, however small as compared to the great body of the proof, we have no right to meddle with the weight of it, or ignore it because negative in character. We deem it not space misused to reproduce some excerpts from a case in the House of Lords (Railroad Co. v. Slattery, L. R. 3 App. Cas., pp. 1155, 1164-5, 1167, 1181, 1182-3).

The Lord Chancellor said: "There is thus opposed to the evidence of *two persons* who say they did not hear, which may mean they did not observe, the whistle, and of one who says he did not hear it, but will not swear it did not take place, a body of witnesses, *ten in number,* including every person whose evidence could be supposed to be material, all of whom seemed to me to be entirely unimpeached and unimpeachable, who state in the most positive way that the whistling did take place.

"My Lords, I have already said that your Lordships have not now before you the question of whether the verdict was against evidence, or against the weight of evidence. But I feel bound to say that if that question were now open, I should, without hesitation, be of opinion that a verdict more directly against evidence I have seldom seen. It is stated that the learned judge before whom the case was tried was not dissatisfied with the verdict. I can only express my surprise that this should have been the case. As it is, it appears to me that the jury, actuated perhaps by feelings of compassion for a plaintiff who is no doubt much to be pitied, and willing to gratify those feelings at the expense of the appellants, have found the 'first issue, that of negligence on the part of the appellants, for the respondent, when it ought to have been found for the appellants. This, however, as I have already said, is not a reason for entering the verdict for the defendant. It is only a ground for a new trial. . . . I certainly cannot look on the result of this litigation as satisfactory. The appellants will, I fear, have to pay a sum for which I cannot think they ought to have been made liable, and the respondent and her children will recover money to which I do not think that their legal right is established. *But I cannot seek to prevent this by proposing to your Lordships,* on the only part of the case which is brought for your deter-

Dutcher v. Railroad.

mination, *to do what it appears to me would seriously encroach upon the legitimate province of a jury.*"

And Lord O'HAGAN, in the same case, said: "My Lords, the principle on which, I think, this case ought to be decided appears, to me to be well expressed in the trite maxim, *'Ad quaestionem juris respondent judices; Ad quaestionem facti respondent juratores.'* That maxim is old but cannot be obsolete whilst trial by jury subsists among us. . . . As to the first question, whether the defendants were guilty of negligence, I cannot see how, possibly, it could have been taken from the jury. I shall not occupy the time of the house by any repetition of the narrative which has been lucidly given to it by my noble and learned friend on the woolsack. I shall only remind your Lordships that the learned Lord Chief Baron PALLES rightly confined the attention of the jury to the consideration of the alleged want of whistling, as the one instance of negligence with which they had to do; and that with reference to it there was a large body of testimony and clearly conflicting testimony. *Ten* witnesses for the defendants swore that *the whistling occurred* at the proper time and in the usual way; *three* witnesses for the plaintiff swore that, being in a position in which, if it so occurred, the sound should have reached their ears, *they did not hear it.* It is impossible not to be struck by the apparent weight of the defendants' proof. But, as was observed in the Irish Court of Common Pleas, the jury saw the witnesses, and the judge did not condemn the verdict. And, whether it was right or wrong, *the jurors along were competent, legally and constitutionally,* to decide between the ten who testified on the one side and the three who testified on the other. It was urged, and the authority of an eminent judge was vouched to sustain the suggestion, that proof of the want of hearing was no material proof at all. But this seems to me untenable. Assuming that a man stands in a certain

position, and has possession of his faculties, the fact
that he does not hear what would ordinarily reach
the ears of a person so placed, and with such oppor-
tunities, seems to me manifestly legal evidence, which
may vary in its value and persuasiveness—which may
in some instances be of small account, and in others
be the strongest and the only evidence possible to be
offered; but at all events cannot be withheld from the
jury. And if this be so, there was here a conflict of
testimony on which *the jurymen, and they alone, were
competent to pronounce.*"

The doctrine thus announced finds support in cases
cited from our own reports in the briefs of counsel
for respondent.

Again, taking the plainly confused situation, a
situation so open and unusual as to be properly des-
ignated extraordinary—a situation in which a pru-
dent engineer could see that there was a probability
of alarm signals being drowned in the great volume
of noise made by the heavy M. K. & T. freight train
thundering past and near her—did the engineer use
due diligence in applying his emergency brake? Did
he not wait until he must have seen and known that
the use of the brake was bound to be an idle formula?
Mark, he could not possibly stop, after he began to
stop, in time to save her at the rate he was going. He
knew that or was bound to know it, which is the same
thing. If the emergency was turned on precisely when
the alarm signals began then there is some testimony
tending to show that the air went on not 600 feet away,
as the engineer says, but a great deal closer than that.
Their spontaneous and instinctive judgment, born of
facts that lay before the eyes of the railroad employees
on the M. K. & T. train, showed them during the time
their train was approaching and running for twelve
or fifteen hundred feet, as we figure it, that this woman
and child were in deadly peril and were unconscious

of it. What they saw the Wabash engineer must also ·be held to see.

We are not dealing with a case where a person attempts to cross a track so closely before a locomotive that the engineer has no time to save life, nor with a case where the peril of a trespasser is not seen in time to save him, nor with a case where there is nothing to prevent the alarm signals being effective. We are cited to many cases of that sort, but they are not in point under the record in the instant case.

Our conclusion is there was a case for the jury, hence the demurrer was well ruled.

II. While the main proposition for reversal (on which the whole force of the oral argument and marked labor in collecting authority in briefs were spent) is the demurrer to the evidence, yet, as said at the outset, there are subsidiary assignments of error, viz.: Defendant's counsel lodge sundry objections against two instructions. One is that without any evidence to support them the court submitted issues whether signals or warnings were given, whether any efforts were made to prevent injuring plaintiff, and authorized a recovery without a finding that the engineer realized plaintiff did not hear the signals. Another is that it was erroneously assumed that plaintiff would have heard a whistle if one had been sounded, and erroneously assumed that the engineer discovered plaintiff's peril in time to save her by the exercise of ordinary care. Another is that the same instruction authorized a verdict if she did not hear the signals although the engineer may have had every reason to believe she did hear them, and in that particular there was a conflict with four of defendant's instructions—that the instruction did not require the jury to find from the evidence that given signals were not heard, or that the engineer had good reason to believe they were not heard and after he discovered her

peril could by ordinary care save her. Another is the alleged assumption that the engineer could have stopped the train after discovering plaintiff's peril, and that it required more than the exercise of ordinary care. Another to both instructions is that they submitted to the jury the question whether plaintiff was a trespasser and was guilty of contributory negligence when that fact should have been declared as a matter of law by the court.

Acquiescing in the controlling prominence given to it by counsel, we considered the main proposition so fully that we feel justified in not disposing of those objections *seriatim* on full discussion, as we would have done if a suitable length to this opinion permitted. Counsel must rest content with the general ruling, to-wit, that we have not been able to find reversible error in instructions.

We make these general observations and let it go at that, to-wit:

The ruling on the demurrer disposes of some of them.

Some of them are refined and technical to a degree reflecting no little credit on the acumen of learned counsel, but in no way, that we can see, affecting the merits or tending to mislead the hard-headed men in the box.

In some of them, suggested doubts and uncertainties are cleared away under the doctrine of aider by one or the other of the twelve instructions given for defendant.

Some of them are answered by a reference to the testimony of the witness Collins who was watching the train and testified, in effect, that it did not slacken its speed until after plaintiff was struck (that testimony may have been untrue, but its falsity is not for our determination. Plaintiff was entitled to reckon with it as one hypothesis).

Some of them are answered by a reference to the negative testimony which, as heretofore pointed out, tended to show no alarm signals were given up to the time Miss Dutcher was struck. (However, liability was not alone predicated on that fact, but the matter was woven into an instruction and coupled with other facts put to the jury by the conjunction ''and.'')

Taking the whole body of the instructions (defendant's with plaintiff's) and reading them together, as we must, the case was fairly put to the jury.

The point is disallowed to defendant.

III.  The court refused twelve of defendant's twenty-four instructions.  Error is assigned on that score—the demurrer was one and is already decided.

One of those remaining told the jury that no warning signals were necessary until after the engineer discovered the teacher did not hear the rumbling of his train.  It was well refused.  When a twist of the wrist will sound a warning signal, why should an engineer dally and twiddle by speculating on the effect the rumbling of his own train had on a woman who was within the sound zone of a much nearer and much greater train?  There is no testimony this engineer relied on *rumbling.*

Another was refused which practically declared, upon facts admitted, that plaintiff was precluded of recovery beause she walked leisurely down the track without turning her head, and this although the jury believe ''that no signal was given nor effort made to stop the train.''  That instruction was not the law of a case falling within the humanity rule.  The demurrer disposed of it.

Another was refused declaring, in effect, that an alarm signal at 600 feet was due care and that the engineer was not required to stop the train when he came in stopping distance of plaintiff.  That might be good law in a proper case, but not under the cir-

cumstances we are dealing with. The disposition made of the demurrer disposes of it precisely as the trial court did.

Another was refused calling the jury's attention to the noise of the M. K. & T. train and declaring as a matter of law that because of that noise it was plaintiff's imperative duty to look behind to see if a train was approaching, and if she failed in that she could not recover. In effect, that was mandatory instruction for defendant, therefore is covered by the demurrer and must be similarly ruled.

Another was refused declaring as a matter of law that if the alarm signals and attempts to stop began 600 feet from plaintiff and continued until she was struck she could not recover. That instruction invaded the province of the jury in determining what was due care under the particular circumstances of this case. Assuming our ruling on the demurrer is sound, the instruction was not the law of this case.

Another was refused declaring as a matter of law that plaintiff was guilty of such contributory negligence as precluded recovery. That instruction was in the very teeth of the humanity rule as expounded in the first paragraph of this opinion.

Another was refused telling the jury that defendant owed no duty to plaintiff except to not willfully and wantonly run upon her without warning. The willfulness and wantonness doctrine is exploded. The touchstone of duty in the law of negligence is due care, not a shade less or more. Due care under the circumstances of this case does not exclude the duty to stop, as the instruction does.

Another was refused taking from the jury the right to consider the noise made by the M. K. & T. train. That instruction eliminated the most pregnant fact in this case with one stroke of the pen. Defendant would hardly admit that it employed engineers' who did not know that M. K. & T. trains made noises

the same as Wabash trains, or who are ignorant of the immutable law of physics that the proximity of a greater noise has a tendency to drown out more distant noise. Any boy who ever worked around a threshing machine when the dinner horn blew knows that. The evidence relating to this noise was admitted over objection. We shall recur to the matter when that ruling is considered. Some of defendant's suggestions anent the instruction may be better disposed of then.

Another refused instruction was predicated of the theory that if a whistle was sounded and if it could not be heard because of the noise of the M. K. & T. train then in that event plaintiff should be cast. That was not the law of this case either.

Another declared it to be the law that if the whistle was blown from three to six hundred feet from plaintiff and afterwards until she was struck and the engineer did all in his power to save her after discovering she did not get off the track to avoid her own injury, then the verdict must be for the defendant. That instruction under the circumstances of the case invaded the province of the jury by limiting the distance in which the engineer was obliged to begin an effort to warn and save plaintiff to within three to six hundred feet. It was well refused.

Another told the jury there was no evidence that plaintiff's position was one of peril from which she could not easily extricate herself (quoting) "until the train got so close *to had* no time to step *off her that she the track."* We are not quite sure we understand the whole of this instruction. The part we do understand was wrong, the part we don't understand we express no opinion upon. If there was any substance in the quoted part, as originally drawn, it is likely counsel would have seen to it that it was brought here in proper form.

There was no error in refusing instructions for defendant.

IV. Error is predicated of a ruling of the court permitting plaintiff to show the noise of the M. K. & T. train, and further that any experienced person observing the trains could see that the two would pass at about the place she was struck. It is argued these were specifications of negligence not pleaded in the petition. But these facts were *evidential*. They related to the charge of a failure to use due care in warning and stopping. We think the point without substance.

V. The court modified and gave for defendant instruction 15, reading: "The court instructs the jury that under the evidence in this case the plaintiff was a trespasser on defendant's railroad track and the defendant owed her no duty *in the first instance* except to warn her by the usual signals of the approach of the train in time for her to step off the track and avoid being struck." (Note: the italicized clause was written in by the court). As originally written the instruction was bad in excluding any duty to stop under any circumstances. Even as modified and given it is not in accord with the bulk of defendant's testimony which pointed to a situation at the time apparently demanding the instantaneous application of the air with the blowing of the whistle. If it did any harm it did harm to plaintiff, not defendant.

VI. It is next argued that the inflammatory argument of plaintiff's counsel was grossly prejudicial and that the court erred in overruling defendant's objections thereto and in failing to rebuke counsel; and next that the verdict is excessive. We do not think the verdict excessive. Plaintiff is confessedly a permanent cripple, her chances to get on in life are lessened, her injuries are extremely grave and her sufferings pro-

Dutcher v. Railroad.

longed, accute and not over. There is no evidence of simulation or hysteria. She asked $40,000 and got one-fourth of it. Compared with many judgments we meet with here, it was sober and modest, reflecting credit on the management of defendant's counsel.

We have examined with pains the colloquies between court and counsel during the jury argument of Mr. Harrington on behalf of plaintiff. In some of them there was no ruling by the court and no exceptions saved for a failure to rule. In some of them the court on request did admonish and rebuke him. In others objections were made and sustained and no request was made to rebuke counsel. In still others the objections were without vitality.

We do not feel justified in reversing the judgment because counsel by inadvertence was betrayed during the hot foot of the argument into straying a little outside the record, for which he was admonished by the court. To my mind the case is not a close one, and sure it is that the size of the verdict does not show that the inflamation, if any, *arguendo,* bred unseemly inflamation in the mind of the jury.

The premises all considered, the judgment should be affirmed. It is so ordered. *Valliant, C. J.,* and *Ferriss, Kennish* and *Brown, JJ.,* concur; *Woodson* and *Graves, JJ.,* dissent.

## DISSENTING OPINION.

WOODSON, J.—On motion for a new hearing in this cause, one of the judges dissented from the Divisional opinion, and in consequence thereof, the cause was transferred to court in Banc; and upon reargument a majority of the judges dissented from the Divisional opinion and ordered Brother LAMM to write the opinion for the court, which he has done in a very able manner.

241 Sup.—12

But after a careful consideration of his opinion, I am forced to dissent therefrom.

It seems to me that the error my associates have fallen into is in assuming that the employees in charge of the train upon the Wabash road and those upon the M. K. & T., were near each other, and could see and hear each other as though they were seated around a table in a quiet room, discussing the case as we did in consultation; whereas the facts are that when the employees of the Wabash first saw or could have seen the respondent the train upon which they were was about two miles away and was running about fifty miles an hour, and those on the M. K. & T. were a mile or more away in the opposite direction and that train was running about thirty-five miles an hour, neither knowing where they would pass each other, nor where they would pass the respondent, who was somewhere between them.

But independent of that fact, I am still of the opinion that the conclusions reached in the divisional opinion is correct, and I therefore adhere to the views there expressed, and adopt that opinion as my dissenting opinion in Banc, which is hereto attached, and is as follows:

This is an action to recover damages for personal injuries sustained by plaintiff, inflicted by the alleged negligence of the defendant in running one of its freight trains against her on the 6th day of September, 1906, near the city of Moberly, Randolph county, Missouri.

The suit was instituted April 20, 1907, in the circuit court of Adair county, and thereafter a trial was had which resulted in a verdict and judgment for the plaintiff for the sum of $10,000. From that judgment the defendant duly appealed to this court.

Some twenty-five or thirty witnesses testified in the case, and, consequently the abstract of the record

is quite voluminous, covering about two hundred printed pages. For this reason we will be able to state only the substance of the evidence; and as there is but little dispute as to the main facts of the case, a more extended statement of the evidence will not be necessary. However, where there is a conflict in the testimony it will be duly noted in the opinion.

The facts of the case as disclosed by practically all of the evidence are as follows:

The track of the defendant company and that of the Missouri Kansas & Texas Railroad Company (which will hereafter be called the "Katy") parallel each other for several miles, one hundred feet apart, and cross at grade a public highway, running east and west, a short distance south of Moberly, through a strictly farming community.

The plaintiff was struck and injured at a point about three hundred feet south of the crossing before mentioned, which is known as the "Headinghouse crossing." At the place of injury the railroad tracks run through a quarter section of farm land, the Headinghouse crossing being on the north side thereof, and the Terrill crossing being another crossing on another public road a half mile south of the former crossing. The tracks were inclosed by good wire fences and cattle-guards. There were also public roads on the east and west sides of this quarter section of land, thus surrounding this tract of land by four public highways, all of which at the time of the accident were smooth, dry and in good condition. The track at this point had not been used by pedestrians as a public highway.

The following plat, introduced in evidence by plaintiff and marked "Ex. A.," will shed much light upon the scene of the accident.

Dutcher v. Railroad.

PLAT IN CONNECTION WITH ACCIDENT TO MISS MARIE DUTCHER, ONE AND HALF MILES SOUTH OF

MOBERLY, MO.

May, 1907

Scale 400 feet=1 inch

At the time of the injury plaintiff was eighteen years of age` and was living with her brother, Roscoe Dutcher, a quarter of a mile north of the northeast corner of this quarter section of land, on the public road running north and south along the east side of this` quarter section. She was teaching school in a schoolhouse situated on the southwest corner of this same 160 acres.

About four o'clock p. m. on September 6, 1906, after the close of school, plaintiff with one of her . pupils, ten years of age, a daughter of Frank Headinghouse, walked east on the public road on the south side of this tract of land until she came to the track of the Katy. At this point they crossed over the cattle-guard and walked north on said last mentioned railroad about a quarter of a mile, near the whistling post. At the latter point the plaintiff and the said little girl crossed over to the track of the defendant company, which was about one hundred feet east of the track of the former company. The plaintiff testified that as she crossed over to the track of the defendant company she looked north and south and saw no train on either road, and that her view was unobstructed both north and south for more than a mile. The track was practically level with a slight up-grade to the north. Upon reaching the track of the defendant company, she and the little girl proceeded to walk north, she between the rails and the little girl on the ends of the ties west of the west rail. At no time while so walking did plaintiff look or listen for a train behind her, though knowing she was on the main line of the defendant company leading from St. Louis to Kansas City, on which trains were hourly passing. Within a few minutes after they reached the defendant's track an extra freight train from St. Louis rounded the curve three and a half miles south of Moberly, and when a quarter of a mile south of Terrill crossing gave the regular crossing whistles, being two long and two short

blasts.    This train was composed of twelve cars, a caboose, engine and tender, and was about five hundred feet in length.    Eight of the cars were equipped with air-brakes, and four of them were without air-brakes.    At the whistling post, midway between the Headinghouse and Terrill crossing, the regular crossing whistles were blown for the former crossing.    The engineer saw the plaintiff and the little girl walking along the track in the manner before stated.    He first saw them when he was about a mile from them.    He testified that he had no reason to doubt that they had heard the signals and would leave the track, but almost immediately after giving the crossing whistles he began to think they had not heard them, and seeing that they did not look around or step aside he immediately applied the air in emergency, pulled the sand lever and began giving the danger signals and continued them until she was struck.

He also testified that when he applied the air the plaintiff was about six hundred feet in front of the engine.    Practically all of the witnesses testified that the danger whistles were continuously sounded, and that the fireman rang the bell constantly until plaintiff was struck, which was at a point about three hundred feet south of the Headinghouse crossing.    S. G. Brown, a brakeman on the defendant's train, was riding in the pilot of the engine and as the train approached the plaintiff he called to her at the top of his voice, warning her of her danger, but was unable to attract her attention.

Immediately before and at the time plaintiff was struck a freight train on the Katy was passing south. Practically all of the employees on this train saw the plaintiff, heard the danger signals given by the defendant for her, and several of them called to her and pointed back to the defendant's train, warning her of its approach and of her danger.    She saw and heard them but heeded them not, because as she testified, "I

thought they were trying to flirt with me, so I turned my face to the north and walked on.''

Prior to the application of the air-brakes the defendant's train was running from twenty-five to thirty-five miles an hour, and at the time it struck plaintiff it had slowed down to a speed of from sixteen to eighteen miles an hour.

The evidence also tended to show that this train, equipped as it was with due care could have been stopped in a distance of from eleven to twelve hundred feet, and within three hundred feet if the train was running only twelve miles an hour. The engineer and fireman who were in charge of this engine testified that they did everything in their power to warn the plaintiff of her danger as soon as they had reason to believe she was not going to leave the track, and that immediately they employed all the appliances at their commmand to slacken the speed of and to stop the train, and thereby avoid striking her, but all to no avail, as the train was too near her to be stopped before striking her. The engine ran some six or seven hundred feet after striking the plaintiff, or some eleven or twelve hundred feet after the emergency brakes were applied.

I.  Counsel for plaintiff base her sole right to a recovery upon the last-chance or humanitarian doctrine.

The first insistence is that the verdict and judgment should stand, for the reason that the engineer in charge of the engine which struck the plaintiff testified that he saw her on the track for a distance of a mile before the train struck her, and that there was evidence tending to show that he failed to give her any warning whatever of the approaching train.

The evidence above referred to is the testimony of the witness Collins, introduced on behalf of plaintiff, who testified as follows:

"Q. State Mr. Collins, whether or not from the time you first observed the train when it was about one-fourth of a mile from her as you have stated, whether or not from that time on until the time it struck her there was any whistling by the Wabash train? A. I heard the whistling, but don't know which engine was doing the whistling. I heard whistling. I saw no steam from the Wabash whistle. I don't remember of hearing any bell."

If this had been all of Mr. Collin's testimony touching that proposition it might have had some weight and probative force, but when read in connection with all of his testimony but little, if any, importance should be attached to it.

Previous to giving the above testimony Collins testified that he was a peddler and that at the time of the accident he was walking south on the Katy track, and saw plaintiff on defendant's track. He stepped aside to allow the train on the former road to pass; and that at the time he was two hundred feet north of the Headinghouse crossing, or about five or six hundred feet north of the point where the plaintiff was struck. He also testified that he did not remember whether he stepped off on the east or west side of the Katy train. But a little later on he further testified as follows:

"Q. Where was the Katy engine at the time she was struck? A. On the Katy track. "Q. I believe you located Miss Dutcher here somewhere south of the Headinghouse crossing, and you say, as I understand, the caboose of the M. K. & T. train was directly west to her—is that right? A. Did I say that?

"Q. Where was the caboose? A. A little south of her.

"Q. How much? A. I have no idea.

"Q. Then you can't give us any idea whether that caboose was ten feet south of her or one hundred

feet or two or three hundred feet.  A.  No, it was not very far south of her.

"Q.  Is that approximately correct?  A.  I was right square behind that train, how could I tell?  If I had been at the side may be I could give you some idea."

The evidence in the case, as well as Collin's own testimony when all read together, conclusively shows that he stepped off on the west side of the Katy train, and that said train completely obscured his view of the approaching train on the defendant's track. That being true, of course he could not state, as he subsequently admitted, which engine gave the danger signals which he said he heard; nor could he, for the same reason, see the steam escape from the defendant's engine had it done so.  In fact, by reading Collin's testimony it will be seen that he nowhere states that he was in position to see or that he looked at the defendant's engine or at the escaping steam therefrom—he only stated that he saw no steam.  That being true, as before stated, his evidence was insufficient to sustain a verdict, especially when the record discloses that a score or more of witnesses, some of whom were introduced by plaintiff and others by the defendant, testified that the danger signals were repeatedly given by the defendant company in ample time for the plaintiff to have stepped from the track.

This insistence is, therefore, ruled against the plaintiff.

II.  It is next contended by counsel for plaintiff that the defendant was guilty of negligence in not slacking the speed of or stopping the train after its employees saw her in a place of danger, although they had ample time in which to have done so had they exercised ordinary care under the circumstances.

We are not certain that we clearly understand

the position of counsel in the premises, which is stated by them in the following language:

"The M. K. & T. train was composed of twenty-five cars and an engine, and while a witness estimated it at about nine hundred feet in length, it must have been about ten hundred and fifty, certainly not less than one thousand feet long, and we shall hereafter treat it as being one thousand feet in length.

"At the time of accident the M. K. & T. caboose was directly opposite or a little south of plaintiff, estimated by the witness as being all the way from directly opposite to three hundred feet south of her. It is thus clear, being a fact physical in its nature, that from the time the firemen and other operatives on the M. K. & T. train began waving at plaintiff and the time she was struck said M. K. & T. train ran a distance of from thirteen hundred to sixteen feet.

"It was proven by the plaintiff and admitted by the defendant's witnesses that when the M. K. & T. operatives began waving at plaintiff the M. K. & T. engine was at the Headinghouse crossing, three hundred feet north of plaintiff, and when plaintiff was struck the M. K. & T. caboose was from directly opposite plaintiff to three hundred feet south of her.

"The M. K. & T. train was running from fifteen to twenty-five miles an hour, and the Wabash train was running from twenty-five to thirty miles an hour. Thus, while the M. K. & T. train was running the thirteen hundred to sixteen hundred feet the Wabash train necessarily moved a distance of from sixteen hundred to eighteen hundred feet.

"It is also true the conductor and brakeman in the M. K. & T. caboose discovered plaintiff's peril and began waving at her when they were as far away from plaintiff, or practically as far away from her, as the engineer in the Wabash engine; therefore said Wabash engineer had as good an opportunity to see plaintiff and the little girl, and observe their manner and

conduct, as the conductor and brakeman and other operatives in the M. K. & T. caboose.

"After the Wabash train struck plaintiff it ran a distance of seven hundred and forty to seven hundred and fifty feet before it stopped. This is evident because the train stopped so that the rear of the train was two carlengths south of the Headinghouse crossing. Plaintiff was struck at a point three hundred feet south of the Headinghouse crossing. Said train therefore ran the length of the train and the distance between the point of accident and the rear end of the train at the place where it stopped, that distance being from seven hundred and forty to seven hundred and fifty feet."

The foregoing process of locating the trains on the M. K. & T. and Wabash tracks, immediately prior to the accident, the rates of speed each was traveling and the place where the latter stopped after striking plaintiff forms the basis upon which the contention is made that the train which struck plaintiff must have run a distance of from sixteen hundred to eighteen hundred feet after the employees on the M. K. & T. road saw her perilous position, and at which time the servants in charge of the defendant's train should have discovered it had they exercised ordinary care, which would have given defendant's servants ample time in which to have stopped the train before it struck her.

While counsel for plaintiff, in our judgment, have not fairly stated the substance of the evidence bearing upon the several propositions presented which constitutes the basis of their contention, but in lieu thereof have stated their own conclusions and deductions drawn from the evidence, but for the sake of argument we will suppose that the evidence did tend to support the second contention of counsel for plaintiff, as stated at the beginning of this paragraph; but in so doing we must not overlook the fact that simply

because the engineer did not sound the danger signals or attempt to stop the train when he first discovered plaintiff on the track that was any evidence that he was guilty of negligence in that regard, for the reason that the law is well settled in this and other states, that the trainmen have the right to presume that adult persons walking upon the track for convenience can hear an approaching train and will heed all danger signals given, and will get out of its way. It is equally well settled that they may rely upon that presumption until they are informed or have reasonable grounds to apprehend such person is ignorant of the train's approach, or that he has not heard the signals given. [Maloy v. Railroad, 84 Mo. 270, l. c. 275; Bell v. Railroad, 72 Mo. 50; Sinclair v. Railroad, 133 Mo. 233.]

In discussing the foregoing principles of law, this court in the case first mentioned used this language: "There is no evidence that it was owing to any neglect of duty that his danger was not discovered sooner. The engineer may have seen him, when he was two miles west of the trestle. Was it his duty then to stop the train or check its speed? He may have seen him when within a hundred yards; did the duty then arise to stop, or check the speed of the train? If the train men must stop the train or check its speed whenever they see a trespasser on the track, of what practical utility would railroad time tables be? The case, even with such of the additional evidence as could possibly have been admitted in the first instance, would not have been such as to entitle plaintiff to a verdict. The train men have a right to suppose that adult persons walking upon their track for their convenience, can hear an approaching train, and will get out of its way. This train made such noise that persons a quarter of a mile further from it than the deceased heard it distinctly, and recognized it as the noise made by an approaching train."

And in the second case cited, the court, speaking through Judge NAPTON, said: ''It may be observed in advance of an examination of the real point and only point involved in this case, that young Bell was guilty of the grossest negligence beyond all dispute, a negligence difficult to be accounted for, assuming him to have been a young man of ordinary intelligence and without any defect of sight or hearing, and there was no proof that he was not. His father had recently moved into the neighborhood of Meadville, and he had never lived near to any railroad before, and the boy was, therefore, naturally not familiar with their detailed operations. Still he must have known, without any such familiarity, of the danger of standing on a railroad track and of the necessity of watching for the approach of a train. He must have known that a person in such a position, to be safe, must use his eyes and ears. His attention was absorbed by a locomotive of a freight train on the switch south of the main track. My conjecture is that he believed that he was on a switch himself and that the main track was the one where he saw this train standing preparing to move. He must have heard the alarm whistle which was sounded repeatedly, at first at a distance of 600 feet, but, as I conjecture, thought the approaching train was on the same track with the train before him. It is true he did not hear the man who hallooed to him to get off the track, to look out for the train, because the wind was blowing rather strong from the west or northwest, but the sharp whistle used to alarm cattle would be far more distinct and powerful than a human voice, and could scarcely have been unheard. He had time after the whistle was sounded to get off the track—he was near the south rail—and two steps would have placed him out of the reach of the cars. . . . . The engineer had a right to assume, when the boy came in sight, that he would step off upon the sounding of the alarm whistle, and the only question

in the case was, whether, upon seeing the boy's position on the track, and that he persisted in staying there after repeated and continuous alarms of the whistle, the engineer did use all of the appliances in his power to prevent a collision, according to his best judgment. Judgment reversed and cause remanded."

There are numerous other cases in this court announcing the same rule.

In passing we may with propriety state that in the case at bar the plaintiff did not make out as strong a case against the defendant as the plaintiffs did in the cases quoted from, for unquestionably she heard the danger signals, which were sounded several times, and saw the employees on the Katy train pointing to the approaching train on the defendant's track; but, unfortunately for her, she disregarded them, believing doubtless, the blasts of the whistle were from the Katy train, and that the gestures and warnings given her by the employees of the latter were flirtatious. All of this was the plaintiff's misfortune, but in no sense was it the fault or negligence of the defendant.

But independent of that, the main reason why plaintiff should be denied a recovery in this case is, according to her own theory of the case, she was guilty of the grossest kind of negligence, amounting almost to recklessness, which continued down to the place of and to the very instant of her injury, and directly contributed thereto. Upon this question the evidence was undisputed, that plaintiff crossed over the cattle-guards into the inclosed right of way of defendant, and walked about a quarter of a mile down the center of the trunk line of defendants without looking or listening for approaching trains, notwithstanding she knew trains were hourly passing thereon, heedless of the danger signals given, which were continued down to the moment the injury occured, and equally unmindful of the warning given her by the employees in charge of the Katy train.

If it should be conceded that the defendant, in the first place was guilty of negligence in not stopping or slackening the speed of the train in time to have prevented striking plaintiff, still it stands undisputed that she was given timely warning of the train's approach, and that had she heeded that warning she would have had ample time in which to have stepped from the track, and thereby avoided the injury. Her failure to do so was clearly contributory negligence, if not the sole and proximate cause of her injury.

Upon this state of the record, according to the rule laid down by all of the best considered cases in this state and elsewhere, the plaintiff is not entitled to a recovery, for the reason that the humanitarian or last-chance doctrine has no application, but the law of contributory negligence governs.

While I do not believe in the wisdom of the so-called humanitarian or last-chance doctrine, for the reasons I point out in the case of Murphy v. Railroad, 228 Mo. 56, since, however, none of my learned associates concurred in my views there expressed, that doctrine must be acquiesced in and accepted by all as the settled law of this State, and I humbly bow thereto. But in doing so I recognize, as all others do, that there is at least an apparent conflict between some of the cases of this State bearing upon that subject.

The cleavage separating the humanitarian doctrine from the law of negligence and contributory negligence as hewn by this court has not at all times been as clear as it might be hoped for, consequently both the bench and the bar have met with much confusion and difficulty in its administration; and for that reason, even at the risk of being criticised for prolixity, I feel justified in stating the origin of the humanitarian doctrine, the reason for its existence, its growth and when applicable, as shown by some of the leading cases bearing upon that subject.

The humanitarian or last-chance doctrine had its origin in the year A. D. 1842, and was first definitely announced in the case of Davies v. Mann, 10 M. & W. 546.

Before stating the facts of that case, I desire to call *special attention* to the fact that the plaintiff's negligence had *culminated and ceased to be a factor in the case,* and notwithstanding that fact, *thereafter the defendant being concious of the peril of plaintiff's ass,* and that it could not save itself, drove his team and wagon over and killed it, *without exercising ordinary care* to save the brute. In the consideration of the cases, I hope the foregoing observations will be constantly in mind.

The case above mentioned established an important exception to the rule of contributory negligence, called by some the "humanitarian doctrine," and by others the "last-chance doctrine." The facts and opinion in the case mentioned are as follows:

"Plaintiff having fettered the fore feet of an ass belonging to him, turned it into a public highway, and at the time in question, the ass was grazing on the off side of the road about eight yards wide when the defendant's wagon with a team of three horses, coming down a slight descent at what the witness termed a smartish pace, ran against the ass, knocked it down and the wheels passing over it, it died soon after. The ass was fettered at the time and it was proved that the driver of the wagon was some little distance behind the horses. The learned judge told the jury that though the act of the plaintiff in leaving the donkey on the highway so fettered as to prevent the getting out of the way of carriages traveling along it, might be illegal, still, if the proximate cause of the injury was attributable to the want of proper conduct on the part of the driver of the wagon, the action was maintainable against the defendant; and his Lordship directed them, if they thought that the accident might

have been avoided by the exercise of ordinary care on
the part of the driver, to find for the plaintiff. The
jury found their verdict for the plaintiff, damages 40
s.''

"PARK, B.    This subject was fully considered by
this court in the case of Bridge v. Grand Junction
Railway, 3 M. & W. 246, where, as appears to me, the
correct rule is laid down concerning negligence, name-
ly, that the negligence which is to preclude a plain-
tiff from recovering in an action of this nature, must
be such that he could, by ordinary care, have avoided
the consequences of the defendant's negligence. I am
reported to have said in that case, and I believe quite
correctly, that "the rule is laid down with perfect cor-
rectness in the case of Butterfield v. Forester, that,
although there may have been negligence on the part
of the plaintiff, yet unless he might, by the exercise of
ordinary care, have avoided the consequences of the
defendant's negligence, he is entitled to recover; *if by
ordinary care he might have avoided them he is the
author of his own wrong!* In the case of Bridge v.
Grand Junction Railway Co., there was imputing neg-
ligence on both sides; here it is otherwise; and the
judge simply told the jury that the mere fact of negli-
gence on the part of the plaintiff in leaving his don-
key on the public highway, was no answer to the ac-
tion, unless the donkey's being there was the immedi-
ate cause of the injury; and that if they were of the
opinion that it was caused by the fault of defendant's
servant in driving too fast, or which is the same thing,
at a smartish pace, the mere fact of putting the ass
upon the road would not bar the plaintiff of his action.
All that is perfectly correct; for, although the ass may
been wrongfully there, still the defendant was bound
to go along the road at such a pace as would be likely
to prevent mischief. Were this not so, a man might
justify the driving over goods left on a public high-

way, or over a man asleep there, or the purposely
running against a carriage going on the wrong side of
the road.''

In Dyerson v. Railway. 174 Kan. 528, 87 Pac. 680,
7 L. R. A. (N. S.) 133, this question is considered with
much care and great force. We quote from page 141:

''If in the present case the plaintiff was entitled
to recover in spite of his own negligence, it must be
because the order of its occurrence with respect to
that of the defendant made the latter the proximate
cause .of the injury. This, indeed, is his contention,
and to support it, reliance is placed upon the following
text, which was quoted with approval in Metropolitan
Street Ry. Co. v. Arnold, 67 Kan. 260, and the sub-
stance of which is to be found also in volume 7 of the
Encyclopaedia, at page 387; 'And upon the principle
that one will be charged with notice of that which by
ordinary care he might have known, it is held that if
either party to an action involving the questions of
negligence and contributory negligence should, by
the exercise of ordinary care, have discovered
the negligence of the other, after its occur-
rence, in time to foresee and avoid its consequences,
then such party is held to have notice; and his neg-
ligence in not discovering the negligence of the other,
under such circumstances, is held the sole proximate
cause of the following injury.' [7 Am. & Eng. Ency.
Law, (2 Ed.). p. 387.] This may be accepted as a cor-
rect statement of a principle of universal application,
according with both reason and authority, provided the
words ''after its occurrence'' be interpreted to mean
after the person concerned had ceased to be negligent.
The rule that under the circumstances stated the neg-
lect of one party to discover the omission of the other
is to be held to be the sole proximate cause of a re-
sulting injury is not an arbitrary, but a reasonable
one. *The test is, what wrongful conduct occasioning
an injury was in operation at the very moment it oc-*

*curred or became inevitable?* If just before that climax only one party had the power to prevent the catastrophe, and he neglected to use it, the legal responsibility is his alone. *If, however, each had such power, and each neglected to use it, then their negligence was concurrent, and neither can recover against the other.* As is said in the paragraph from which the foregoing quotation is made: 'It is only when the negligence of one party is subsequent to that of the other that the rule can be invoked.' In a note printed in volume 2 of the supplement to the American and English Encyclopaedia of Law, (2 Ed.), at page 64, many recent cases are cited bearing upon the subject and it is said: 'This so-called exception to the rule of contributory negligence (i. e., the doctrine of the last clear chance) will not be extended to causes where the plaintiff's own negligence extended up to and actually contributed to the injury. To warrant its application there must have been some new breach of duty on the part of the defendant subsequent to the plaintiff's negligence.'

"In the present case it may be granted that the negligence of the plaintiff began when he walked between the track and the ice box on the way to get the bucket, and that the employees in charge of the engine were themselves negligent in not discovering this negligence on his part, and the peril to which it exposed him and taking steps to protect him. But his negligence as well as theirs continued up to the moment of the accident, or until it could not possibly be averted. His opportunity to discover and avoid the danger was at least as good as theirs. His want of care existing as late as theirs, was a concurring cause of his injury, and bars his recovery. This determination is entirely consistent with what Mr. Thompson in his work above cited, sec. 240, has styled the "last chance" doctrine, as is obvious from a consideration of the terms in which it is stated. As originally announced it was

thus phrased: 'The party who has the last opportunity of avoiding accident is not excused by the negligence of anyone else. His negligence and not that of the one first in fault is the sole proximate cause of the injury.' Mr. Thompson rewords it as follows: 'Where both parties are negligent, the one that had the last clear opportunity to avoid the accident, notwithstanding the negligence of the other, is solely responsible for it—his negligence being deemed the direct and proximate cause of it.' Expressions are to be found in the reports seemingly at variance with the conclusion here reached, but for the most part the decisions holding a defendant liable for failure to discover and act upon the plaintiff's negligence were made in cases which were, in fact like Metropolitan Street R. Co. v. Arnold, supra, or were decided upon the theory that they fell within the same rule. There the plaintiff's decedent while riding a bicycle was, through his own fault, run into by a street car. He clung to the fender, was carried some seventy-five feet, then fell under the wheels and was killed. A judgment against the street car company was upheld only upon the theory that after he had reached a position of danger *from which he could not extricate himself—that is, after his negligence had ceased,* the defendant's employees were negligent in failing to discover his peril and stop the car. In Robinson v. Cone, 22 Vt. 213, 223, 54 Am. Dec. 67, the writer of the opinion says: 'I should hesitate to say that, if it appeared that the want of ordinary care on the part of the plaintiff, at the very time of the injury, contributed either to produce or to enhance the injury, he could recover because it seems to me that is equivalent to saying that the plaintiff by the exercise of ordinary care at the time, could have escaped the injury.'

"The principle thus intimated was embodied in a decision in French v. Grand Trunk R. Co., 76 Vt. 411, 58 Atl. 722, where it said: 'It is true that when

a traveler has reached a point where he *cannot help himself, cannot extricate himself,* and vigilance on his part cannot avert the injury, his negligence in reaching that position *becomes the condition and not the proximate cause* of the injury, and will not preclude a recovery; but it is equally true that if a traveler, when he reaches the point of collision, is in a situation to help himself and, by vigilant use of his eyes, ears and physical strength, to extricate himself and avoid injury, his negligence at that point will prevent a recovery, notwithstanding the fact that the trainmen could have stopped the train in season to have avoided injuring him. In such a case the negligence of the plaintiff is concurrent with the negligence of the defendant, and the negligence of each is operative at the time of the accident. When negligence is concurrent and operative at the time of the collision, and contributes to it there can be no recovery.'

"To the same effect are these extracts: 'There is no testimony suggesting negligence on the part of the driver that does not convict Doyle of an equal or greater degree of negligence. One had no better opportunity to anticipate the accident, nor any better means of preventing it than the other. If, therefore, there was negligence, it was concurring negligence, continuous and mutual up to the instant of the accident which disentitles the plaintiff to recover. [Consumers' Brewing Co. v. Doyle, 102 Va. 403, 46 S. E. 391]. In numerous cases it has been held that the plaintiff's conduct is not contributory negligence, if, notwithstanding his negligence, the injury could have been avoided by the use of ordinary care by the defendant. That rule prevails when the plaintiff is in position of threatened contact with some agency, under the control of the defendant, *when the plaintiff cannot, and the defendant can* prevent the injury. It does not apply where *both parties are contemporaneously and actively in fault,* and by their mutual carelessness an

injury ensues to one or both of them. . . . . The rule does not apply where, as in the case before us, the negligence of the party injured continues up to the moment of the injury, and was a contributing cause thereof.' [Robards v. Indianapolis Street Ry. Co., 32 Ind. App. 297, 66 N. E. 66, 67 N. E. 953]. 'The plaintiff must show that at some point of time, in view of the entire situation, including the plaintiff's negligence, the defendant was thereafter culpably negligent, and its negligence the latest in the succession of causes. In such case the plaintiff's negligence would not be proximate cause of the injury . . . . The plaintiff not only negligently put himself in a place of peril, but continued negligently to move on to the catastrophe until it happened. The language of the doctrine of prior and subsequent negligence implies that the principle is not applicable when the negligence of the plaintiff and that of defendant are practically simultaneous.' [Butler v. Rockland, T. & C. Street Ry. Co., 99 Me. 149, 105 Am. St. Rep. 267, 58 Atl. 775.]

"In Green v. Los Angeles Terminal Ry. Co., 143 Cal. 31, 101 Am. St. Rep. 68, 76 Pac. 724, it is said of the rule holding the defendant liable notwithstanding the contributory negligence of plaintiff: 'It applies in cases where the defendant, knowing of plaintiff's danger *and that it is obvious that he cannot extricate himself from it,* fails to do something which it is in his power to do to avoid the injury. It has no application, however, to a case where *both parties are guilty of concurrent acts of negligence, each of which, at the very time when the accident occurs, contributes to it.'* Of the same rule it is said in O'Brien v. McGlinchy, 68 Me. 552: 'This rule applies usually in cases where the plaintiff, or his property, is in some position of danger from a threatened contact with some agency under the control of the defendant, when the plaintiff cannot, and defendant can, prevent an

injury. . . . But this principle would not govern where both parties are contemporaneously and actively in fault, and by their mutual carelessness an injury ensues to one or both of them.' In Smith v. Norfolk & S. R. Co., 114 N. C. 728, 755, 25 L. R. A. 287, 19 S. E. 863, 923, the general rule is thus concretely stated: 'Applying the rule which we have stated to accidents upon railroad tracks it may be illustrated as follows: First, there must be a duty imposed upon the engineer as otherwise there can be no negligence to which the negligence of the injured party is to contribute. The duty under consideration is to keep a vigilant lookout . . . . in order to discover and avoid injury to persons who may be on the track and who are apparently in unconcious or helpless peril. When such a person is on the track and the engineer fails to discover him in time to avoid a collision when he could have done so by the exercise of ordinary care, the engineer is guilty of negligence. The decisive negligence of the engineer is when he has reached that point when no effort on his part can avert the collision. *Hence, if A, being on the track and after this decisive negligence, fails to look and listen, and in consequence is run over and injured, his negligence is not concurrent merely, but really subsequent to that of the engineer* and he cannot recover, as he, and not the engineer, has 'the last clear opportunity of avoiding the accident.' If, however, A is on the track . . . and while there, and before the decisive negligence of the engineer, he, by his own negligence becomes entangled in the rails that he cannot extricate himself in time to avoid the collision *and his helpless condition could have been discovered had the engineer exercised ordinary care, then the negligence of A would be previous to that of the engineer and the engineer's negligence would be the proximate cause, he,* and' not A, having lost the clear opportunity of avoiding the injury. The same result would follow in the case of a wagon negligently stalled

when no effort of the owner could remove it, and there are other causes to which the principle is applicable.' The principle running through these cases is reasonable, is consistent with the general rules that have met with practically universal acceptance, and, if adhered to, will correct a part of the confusion now attending the application of the law of contributory negligence. The judgment is affirmed.''

There are able and quite exhaustive notes appended to this case, and to that of Bogan v. Railroad, 129 N. C. 154, 55 L. R. A. 418, written by the learned editor, reviewing all the decisions from the various states, as well as those of the Federal courts, showing that the prevailing rule is that if the negligence of the plaintiff or deceased continues down to the time of the accident the humanitarian or last-chance doctrine has no application.

The following quotation is from the last paragraph, col. 2, p. 422, of the Bogan case:

''But even when the essential prerequisite of a duty resting upon the defendant has been established, there is still another element that must appear before the doctrine can be applied, or at least before it can be applied so as to support a recovery. As already stated, the doctrine operates by characterizing the breach of duty on defendant's part, intervening between the plaintiff's negligence and the accident, as the sole proximate cause of the accident. In order that this condition may exist, it is obvious that the negligence of the plaintiff or deceased must be regarded as having expended itself and having culminated before the breach of the defendant's duty or at least before the culmination of that breach of duty. If, notwithstanding a breach of duty on the defendant's part, the plaintiff's negligence must be regarded as continuing up to the very instant of the accident, it is clear, either that the negligence of the par-

ties is concurrent, and, therefore that a necessary prerequisite of the doctrine is lacking, or that the application of the doctrine will put the plaintiff himself in the position of having had, but for his own negligence, the last clear chance to avoid the accident, thereby making the doctrine operate against him. For instance, *if a person in full possession of all his faculties is walking along a railroad track* upon which he knows trains frequently pass, without paying any attention to his surroundings, and the engineer of an approaching train, by reason of the omission of his duty to keep a lookout, fails to see him, it would seem that the latter would have the last clear chance to avoid the accident, since it is apparent that if he discovers the train (which in the exercise of due care, he is bound to do), he can step from the track and avoid the collision after the train has reached a point at which no effort on part of the engineer can prevent a collision. In the view most favorable to the trespasser, his negligence is, at least, concurrent with that of the engineer. Many of the courts which apply the doctrine seem to pay too little attention to this element. The North Carolina Supreme Court, however, while taking different views at different times as to when the negligence of the plaintiff or deceased must be regarded as continuing, and when it might be regarded as having culminated before the defendant's negligence, have, nevertheless, recognized the importance of this consideration. Thus, the decision in Smith v. Norfolk & S. R. Co., 114 N. C. 728, 25 L. R. A. 287, 19 S. E. 863, 923, denying the liability of a railroad company for running over a drunken trespasser, lying asleep on the track, notwithstanding that the engineer was negligent in failing to see him, is upon the ground that the intoxication of the trespasser did not relieve him from the duty of exercising due care, and that a sober man in the same position would, by the use of his senses have perceived the approach of the train, and have

been able to escape from the track after the engine had reached a point at which any effort on the part of the engineer to avert the accident would have been ineffectual. This decision was afterwards overruled by Pickett v. Wilmington & W. R. Co., 117 N. C. 616, 30 L. R. A. 257, 23 S. E. 264, owing to a change of view on the part of the court with respect to the effect of the defendant's intoxication, the court taking the view in the latter case that the trespasser's negligence was not continuing, but culminated when he lay down upon the track and became unconscious of the danger. A stronger case for holding that the unconsciousness of his danger on the part of a trespasser lying on the track will relieve his negligence from its character as continuing negligence, is where, as was claimed in Houston & T. C. R. Co. v. Sympkins, 54 Tex. 615, 38 Am. Rep. 632 infra, 2, the trespasser had fallen on the track in a fit. In that case it was held that though the trespasser was negligennt in going upon the track in the first instance, he was not chargeable with continuing negligence if his helplessness was due to a fit, but that it would be otherwise if it was due to voluntary intoxication. Some of the decisions that deny the liability of a railroad company for running over a drunken trespasser lying on the track are explainable on the ground that the company owed no duty to keep a lookout for trespassers and others, as already suggested, upon the ground that the negligence was regarded as continuing. These cases may, therefore, be harmonized so far as the doctrine of "last clear chance" is concerned, with cases that hold the company liable under such circumstances.

"If the view of the doctrine of 'last clear chance' herein suggested is correct, it follows that a statement to the effect that contributory negligence will prevent recovery for any but a wanton or willful injury is, when strictly construed, entirely consistent with the doctrine of 'last clear chance,' even when the grava-

men of the action is negligence.  It is probable, how-
ever, that in some cases, in which such statements are
made the court intended to deny any such qualifica-
tions of the doctrine of contributory negligence as that
involved in the doctrine of 'last clear chance.'  In
many of the cases, however, in which such statements
are made, it is clear that negligence of the plaintiff,
though it began before the defendant's breach of duty,
nevertheless continued up to the very instant of the
accident, and was, therefore, subsequent to, or at least
concurrent with the defendant's negligence.  When
that is the case, it frequently happens that the court
simply applies the doctrine of contributory negligence
without referring to any qualification of that doctrine,
except that it does not prevent a recovery where the
injury is willful or wanton.  While that manner of
treatment is perfectly consistent with the doctrine of
'last clear chance,' if the view herein suggested is cor-
rect, it is nevertheless calculated to mislead one, unless
he keeps clearly in mind that the non-continuance of
the plaintiff's negligence is an indispensable prerequi-
site of the doctrine.  It would promote clearness of
view if the courts in such cases, instead of passing
over the intermediate steps and going directly to the
doctrine of contributory negligence, would discuss the
case from the point of view of the doctrine of 'last
clear chance,' and show that while one of the indis-
pensable prerequisites of that doctrine, namely, a
breach of duty on defendant's part, occurring after the
commencement of plaintiff's negligence was present,
the other condition necessary to make the doctrine op-
erate in plaintiff's favor, namely, the cessation of
plaintiff's negligence at some time before the defend-
ant's, was lacking, and, therefore, that the doctrine
could not apply at all, or, if applied, would operate
against plaintiff, because he, and not the defendant,
had the last clear chance to avoid the accident.''

In reviewing the Missouri cases, the learned editor at lower half col. 1, 451, says: ''As already suggested, it is questionable whether the courts in this State have not in some cases applied the doctrine of 'last clear chance,' so as to hold the defendant liable where, if proper attention had been paid to the question as to continuing negligence on the part of the plaintiff, the application of the doctrine would have placed the defendant, or deceased, as the case may be, in the position of having by his negligence lost the clear opportunity to avoid the injury.''

The conclusion to be drawn from all the authorities is that the humanitarian or ''last chance'' doctrine has no application, unless the negligence on the part of the plaintiff or deceased is to be regarded as having ceased before the termination of the defendant's negligence.

See also a discussion of Davies v. Mann, 1 Thomp. Neg., sec. 235, *et seq.* In section 237, Judge Thompson says:

''It is believed that these considerations fairly conduct us to the following rules: 1. If A and B have both been guilty of negligence contributing or tending proximately to produce the injury complained of, A cannot recover damages of B unless, *after discovering the exposed situation of A,* B could have avoided the consequences of A's negligence—that is, could have avoided the injury which took place—by the exercise of ordinary care. 2. One person is not bound to anticipate that another person, being *sui juris,* will negligently expose himself or his property to injury, and is not bound to make provision against the consequences of such negligence. Therefore, if A has negligently placed his person or his property in such a situation that B is liable to injure it in the exercise of his lawful business, and B, without discovering that A has done this, so injures it, B is not bound to pay damages to A, although at the time he committed the

injury he was not proceeding with ordinary care  The foundation of this rule was thus lucidly stated by PETERS, J., speaking for the Supreme Judicial Court of Maine: 'In cases falling within the foregoing description, where the negligent acts of the parties are distinct· and independent of each other, the act of the plaintiff preceding that of defendant, it is considered that the plaintiff's conduct does not contribute to produce the injury if notwithstanding his negligence, the injury could have been avoided by the use of ordinary care at the time by the defendant.  This rule applies usually in cases where the plaintiff or his property is in some position of danger from a threatened contact with some agency under the control of the defendant, *when the plaintiff cannot, and the defendant can, prevent the injury.* . . . But this principle would not govern where both parties are *contemporaneously* and actively in fault, and, by their mutual carelessness, an injury ensues to one or both of them.' This qualification of the rule is aptly illustrated by the case of a collision between a traveler and a train at a railway grade crossing.  The traveler fails to exercise his faculties to discover the approach of a train, and those in charge of the train fail to give the proper signal on approaching the crossing.  When he discovers the train on the one hand, and when the trainman discover him on the other, it is too late to avoid the collision.  In such a case unless the doctrine of contributory negligence is abolished, there can be no recovery.  The negligence of each is a proximate cause of the catastrophe; the negligence of one is just as near the catastrophe as that of the other.  But the courts which adhere to the rule which requires knowledge on the part of the defendant of the exposed position of the person killed or injured as contradistinguished from the duty of knowing, maintain the theory that where one person negligently comes into a situation of peril before another can be held liable for an·

injury to him, it must appear that the latter had knowledge of his situation in time.to have prevented the injury, or it must. appear that the injurious act or omission was by design, and was such, considering time and place, as that its natural and probable consequences would be to produce serious injury.''

This identical question came before this court in the case of Sinclair v. Railroad, 133 Mo. 233. It was there held that where the engineer sees that the trespasser is not informed as to his peril, it is the former's duty to give the latter a sufficient warning, and in time for him to leave the track in safety; and *that if the engineer performed that duty, the plaintiff could not recover, provided his negligence continued on down to the time of the injury.*

Judge MACFARLANE, in discussing that question, used this language:

''The instinct of self-preservation, as well as common judgment, impels one on a railroad track to leave it on the approach of a train. This law of nature is universal with intelligent beings. From this universal law is evolved the legal principle that persons in charge of a train have the right to presume that one walking upon the track will leave it in order to allow a train to pass if they have knowledge of its approach.

''Under the circumstances.in which these parties were placed the immediate duty required of the engineer, when he saw that deceased was unaware of his peril, was to give a proper warning. This duty required such a signal as could have been heard and could not have been misunderstood; such an one would arouse deceased from his apparent mental abstraction or indifference to a sense of his danger, and the necessity of action on his part to avoid it.

''That such a signal was given is not denied, and is established by the evidence of many witnesses and is disputed by none. It was also the usual danger signal. It was heard all over the immediate neigh-

borhood. One witness, called by plaintiff, who was some distance from the place of the accident, described it as a sharp whistle, such as is given for stock on the track, and that it could have been heard two or three miles. The engineer cannot be charged with negligence as to giving a signal, nor as to its character and sufficiency.

"II. The next inquiry is whether the notice was timely. The engineer testified that he first saw deceased when about four hundred feet from him, and immediately gave the danger signal. If his testimony is true, then the charge of negligence in respect to giving the signal is met and refuted. There was no direct evidence that the engineer saw deceased sooner, nor is there a charge of negligence in failing to see. But the evidence shows that deceased was in full view of the engineer for about one-eighth of a mile, and from that circumstance, coupled with the duties of the engineer to his employer to keep a watch upon the track, a jury might infer that deceased was seen for more than four hundred feet. [Rine v. Railroad, 10 Mo. 235.] Assuming, then, that the engineer saw deceased as soon as he came in sight, when did his duty of care begin?

"Deceased was bound to know, and, in this case did in fact know, that a train was due behind him. It was his duty to keep a vigilant watch for it. Indeed, that duty is imposed upon all who go upon a railroad track. The engineer had the right to suppose, when he first saw him, that he would hear or see the train and leave the track.

"It was recently said by this court: 'Defendant, of course, had the right of way, and was not bound to anticipate that persons trespassing on the track would not step aside before a coming train.' [Hyde v. Railroad, 110 Mo. 279.]

"In another case it was said: 'When plaintiff stepped on the track, it was the engineer's duty to

warn him, and this he did.  The engineer had a right
to presume that an adult would at once step off the
track and avoid danger.  He was not required to stop
his train until he saw plaintiff was in a position of
danger or peril.'  [Reardon v. Railroad, 114 Mo. 405.]

"In that case the court says further: 'The use of
the steam brake immediately upon his entering upon
the track would unquestionably have stopped the
train, but whether it would after plaintiff had fallen
and it became evident he was in peril, was, at least,
a debatable question.'

"From these cases and many others that might
be cited, it seems to be well settled that where no con-
ditions intervene to confuse, or to prevent hearing a
signal, and knowing its object, it will be sufficient if
given in time for the trespasser to leave the track
safely.

"The question then is, was the signal given in
time to have allowed deceased opportunity to escape
the danger.  The engineer testified that the danger sig-
nal was sounded when the engine was about four hun-
dred feet from deceased.  Other evidence made the
distance three hundred and forty feet.  These are the
maximum and minimum estimates.  If the train was
running twenty-five miles per hour, which was the es-
timated rate, it covered about thirty-six feet every
second, or three hundred and sixty feet in ten seconds.
If deceased walked at the rate of two and one-half
miles per hour, he would travel about three feet a sec-
ond, and thirty feet in ten seconds.  Five feet would
have taken him out of danger.

"McDowell, a witness for plaintiff, testified that
while working about his barn he heard the whistle and
thinking some of his stock was in danger he stepped
around to a point from which he could see the train
and deceased.  It required about three steps in order
to get the view.  He saw deceased walking down the
track as though he did not know the train was follow-

ing. After he got in sight the engine whistled two more times, the last of which was just as deceased was struck. After he came in sight of deceased he took three or four steps before he was struck. Even according to the evidence of this witness deceased must have walked fifteen or twenty feet after the danger signal was given. He had therefore ample time to have escaped the danger after the signal.

"The engineer was not, therefore, negligent in respect to his first duty on ascertaining that deceased was not aware of the approach of the train.

"III. The petition charges further that the engineer negligently failed and neglected to use the air brakes and other appliances ready and at hand for stopping the train. In other words, the charge is that the engineer was negligent in not stopping the train in time to avoid striking deceased. This duty of the engineer arose as soon as he knew, or by proper care ought to have known, that deceased did not regard the warning signal. The engineer on this question testified that after giving the signal, and observing that deceased did not heed it, he immediately put on the full force of the air-brakes, reversed his engine, and did everything in his power to arrest the speed of the train and stop it, continuing, at the same time, to sound the alarm whistle. His evidence receives some corroboration from the trainmen and some other witnesses. There was no direct contradictory evidence. One of plaintiff's witnesses who had been a locomotive engineer testified that the engine was reversed between the first and second whistles, and the air-brakes were on when the train stopped, but he did not know when the air was applied.

"The evidence tended to prove, though conflicting on the question, *that the engine ran five hundred and sixty feet after deceased was struck. The evidence*

241 Sup.—14

*also tended to prove that the train could have been stopped in six or seven hundred feet.* From these facts the further fact that everything was not done that could have been done to stop the train might be inferred. *But that is not the question.* The question is whether the train could have been stopped in time to have avoided the calamity. *If it could not and the collision was inevitable, unless deceased acted, then, though the engineer was negligent, it could not be attributed to defendant as the proximate cause of the disaster.*

"When such dire results occur in so brief a period of time it is difficult to measure accurately either time or distance. Suppose the engine was three hundred and fifty feet from deceased when his duty to warn him arose, and the train was running twenty-five miles per hour, or say thirty-five feet per second. The engineer sounded the whistle and observed its effect. Say that occupied only three seconds, it could scarcely have been less. The train had then run one hundred and five feet nearer to deceased. Take two seconds more for applying the brakes and reversing the engine and the train moved seventy feet farther, before its motion could have been retarded. The engine was then within one hundred and seventy-five feet of deceased. Suppose it ran five hundred and sixty feet after it struck deceased, the stop would have been made in seven hundred and thirty-five feet, a very little over the shortest estimated distance. But, conceding that the train could have been stopped in six hundred feet, it is perfectly clear that the life of plaintiff's husband could not have been saved by anything the engineer could possibly have done toward stopping the train, for, at most, he had only four hundred feet in which to do it. We must, therefore, conclude that no negligence on the part of defendant was shown.

"IV.   This conclusion obviated the necessity of considering the contributory negligence of deceased after the signal was given. *It was certainly his duty to leave the track immediately on hearing the signal and not to depend upon the engineer to stop the train. If by reason of a neglect of that duty he was caught on the track his contributory negligence would defeat his recovery though the engineer was also guilty of negligence in not stopping in time to avoid the collision.* The character of the signal was such that in the quietness of that afternoon, and the surroundings, we can conclude it was heard. The evidence also shows that deceased was struck within thirty-five feet of the point at which he would have left the track. It shows further that after the signal was given deceased changed his course from the center of the track in a diagonal direction toward the left rail, and when struck was outside the rail. These facts show conclusively that the signal was heard by deceased. His subsequent conduct indicates that he miscalculated the distance it was from him, and thought he had time to reach the footpath by which he intended to leave the track, or that he had time to walk off deliberately. One or the other of these conclusions must be drawn. In either case there would be contributory negligence.

"We are of the opinion that the evidence shows no liability, and the judgment is reversed. All concur."

The same rule was announced by this court in the case of Prewitt v. Eddy, 115 Mo. 283. GANTT, P. J., on page 303, in speaking for the court said:

"In Fielder v. Railroad, 107 Mo. 645, we held that the facts of that case showed that the engineer saw the girl for six hundred feet, and that he sounded the alarm (at a distance of thirty-five feet); that the girl gave no sign of having heard it. We held that she was then in peril, and as a reasonable man he should have

then checked his train. (Train running twelve to fifteen miles per hour in St. Louis.)

"In Boyd v. Railroad, 105 Mo. 371, the plaintiff's husband stepped upon the track of a railroad running through the town of Renick immediately in front of a train running forty miles an hour. The evidence tended to show that he both heard and saw the train. BRACE, J., in writing the opinion of the court, says there were two explanations of the conduct of deceased. One was that 'dominated perhaps by the first impression received in the house when he heard the whistle, that this was the regular mail (which as a hotel-keeper he was in the habit of meeting) he hastened toward the depot and onto the track without stopping for a moment to test by sense of sight or sound the correctness of his first impression, and as the result of his heedlessness lost his life.' The other view, that 'he may have miscalculated his own speed and that of the train and hazarded the chance of getting across the track in safety before the engine could strike him. In either view his death was the result of his own negligence.' And says: 'It must be conceded that if the defendant's liability in this case is to be limited, as in all similar cases heretofore it has been, to want of care on the part of its servants after they discovered, or by the exercise of reasonable care might have discovered, the deceased in a perilous situation, the plaintiff's evidence wholly failed to make out a case.' See cases cited. The learned judge concludes the case with the observation, '*Unless the doctrine of contributory negligence is to be entirely discarded, and engineers required to be such expert psychologists as to be able to read the minds of men and know before hand when a man in the possession of all his mental factulties is* going to act in a way other than could be expected of an ordinarily prudent man, there was no evidence to take this case to the jury.' "

The same question was again presented in Hogan v. Railroad, 150 Mo. 36, and on page 55, MARSHALL, J., in speaking for the court, said:

"Where both parties have been guilty of negligence, which directly contributed to cause the injury, there can be no recovery, for the courts never undertake to sever, apportion and discriminate between two directly negligent acts so as to decide which act caused the injury.    There is no comparative negligence in this State. . . .

"The rule that the negligence of the plaintiff which contributes directly to the cause of the injury will prevent a recovery, is without exception or qualification.  [Dunkman v. Railroad, 16 Mo. App. 548; Ibid., 95 Mo. 232; Craig v. Sedalia, 63 Mo. 417; Barton v. Railroad, 52 Mo. 253.]  Where the negligence of the plaintiff directly contributed with that of the defendant to produce the injury, there can be no recovery.  [Murray v. Railroad, 101 Mo. 236; Kellny v. Railroad, 101 Mo. 67.]  So if the negligence which produced the injury is mutual, the plaintiff can not recover.  [Packet Co. v. Vandergrift, 34 Mo. 55; Callahan v. Warne, 40 Mo. 131; Corcoran v. Railroad, 105 Mo. 399; Daugherty v. Railroad, 97 Mo. 647; 7 Am. & Eng. Ency. Law (2 Ed.), p. 371, etc.]"

And in Tanner v. Railroad, 161 Mo. 497, BRACE, P. J., in discussing the same question, said:

"As there was some evidence tending to prove that train number ten coming in on track number two was running at a rate of speed exceeding the maximum rate prescribed by the city ordinance, and that its bell was not being rung, the court committed no error in sending the case to the jury, unless by these undisputed facts such contributory negligence on the part of the plaintiff is shown, as to preclude a recovery. That it is so shown is a conclusion as to which reasonable minds cannot well differ. The plaintiff, an adult in possession of all his faculties, familiar with the place,

the time and movement of these trains, without looking or listening or paying any attention thereto whatever, deliberately placed himself in the line of danger of train number ten, coming in on track number two, on time, and is struck, when by looking he could have seen, and by listening he could have heard that incoming train, and have avoided the danger to which he thus voluntarily and unnecessarily exposed himself. A clearer case of contributory negligence could not well be made out. The only shadow of an excuse for such negligence is that he had heard that the bulletin said both trains were on time, and if this was so, then number nine having just come in, number ten would not be in for seven minutes. Hence he paid no attention to his danger from that train. He took no care whatever to verify this report, did not even look at his watch for that purpose. If he had, he would doubtless have discovered that number nine was in fact late, and that number ten was then nearly due. However that may be, while bulletins are required by law, and serve useful purposes, they can at best do more than predict, suggest a probability, as to the arrival of trains, and no man has a right to shut his eyes, close his ears and put himself in a place of danger on or near a railroad track on the faith of such a forecast. No reasonably prudent man will do so. Hence it must be held that the plaintiff was guilty of such contributory negligence, in being within the danger line of track number two, when he was struck, as to preclude a recovery, and that the court committed error in sending the case to the jury, unless after the plaintiff had thus put himself in a place of danger, the conduct of the defendant's employees in the management of the train was characterized by such willful, reckless, or wanton diregard of human life, as that the defendant shall not be heard to say that the plaintiff was guilty of such negligence. [Morgan v. Wabash Ry. Co., 60 S. W. 195; Kellny v. Mo. Pac. Ry Co., 101 Mo. 67.] We

have looked in vain through all the evidence in this voluminous record for indicia of such willful, reckless or wanton disregard of human life upon the part of defendant's servants. There was barely evidence enough to take the case to the jury on the main issues tendered by the plaintiff, and while there was some evidence from which the jury might have found that the train came into the depot grounds at a rate of speed slightly in excess of that prescribed by the ordinance, there is none to indicate a reckless rate of speed. It is also true that there was ample evidence from which the jury could have found that the place at which the plaintiff was struck was plainly visible to the defendant's operatives on the engine, a sufficient distance for them to have safely stopped the train before it reached that place. But conceding all this, what would have been seen by the defendant's servants at that place? No person on track number two on which the train was moving. The plaintiff and several other persons on the platform between that track and track number one, on which train number nine was standing, presumably prudent persons having a proper regard for their own safety, and if any of them were within the line of danger from the approaching train, that they would be on the lookout for it, and would step out of its way as it approached them, and leave the way clear, and hence there would be no necessity for stopping the train on their account before reaching the usual stopping place some two or three hundred feet distant, where it did stop. This would have been the conclusion of an ordinarily prudent manager of the movement of such a train, and the defendant's servants thus managing the train in question cannot be convicted of a willful, reckless or wanton disregard of human life in not stopping the train before it reached the place where plaintiff was struck, because, forsooth, he proved to be an imprudent person without a proper regard for his own

safety, and did not step out of the way of the train, as he might easily have done, and as he would have been reasonably expected to do. The demurrer to the evidence ought to have been sustained.''

And again BRACE, J., in the case of Sharp v. Railroad, 161 Mo. 214, at page 237, said: ''Of course it is impossible to say exactly at what distance the engineer discovered the exact situation of the deceased in regard to the danger line or at exactly what. distance from him the engineer gave the danger signal. But conceding that the situation of the deceased could have been discovered at such a distance as to have suggested the propriety of giving the danger signal sooner than it was given, and that it might have been sounded oftener than it was, there was nothing in the situation that seemed to imperatively demand that it should have been sounded sooner or oftener, and certainly nothing in the whole conduct of the engineer on the occasion that could be characterized as a willful, wanton or reckless disregard of human life, such as is necessary to take the case out of the general rule, that contributory negligence precludes a recovery. The court erred in overruling the demurrer to the evidence, and for this error the judgment will be reversed. All concur.''

And in an earlier case, BRACE, J., said: ''It will thus be seen that it was a physical impossibility for the deceased to have failed to see the approaching train, if he had looked in that direction, as it was his duty to do, while yet in a place of safety, and before entering upon the line of danger. Had he done so, there can be no question that he could and would have stopped his team until the train passed, and then crossed over in safety. But for some unexplained reason he failed to do so. And thus it is, though the defendant may have been negligent in failing to give the signals for the crossing, and in permitting the high grass to be upon its right of way, yet the deceased hav-

ing lost his life through his own negligence in failing to discharge the duty imposed upon him by law, in his situation, the plaintiff cannot recover for his death. This conclusion we find to be irresistible after a very careful examination of all the evidence, in the consideration of which every reasonable inference in favor of the plaintiff has been made. Consequently we cannot find that the trial court committed error in sustaining the demurrer to the evidence and in refusing to set aside the nonsuit." [Hayden v. Railroad, 124 Mo. 573.]

In the case of Zumault v. Railroad, 175 Mo. 288, BURGESS, J., in a learned and exhaustive opinion, on pages 311 to 313, in speaking for the unanimous court, in his usual clear and forceful manner, said:

"It is asserted by defendants that plaintiff was guilty of contributory negligence. Contributory negligence is defined as 'a want of ordinary care upon the part of a person injured by the actionable negligence of another, combining and concurring with that negligence, and contributing to the injury as a proximate cause thereof, without which the injury would not have occurred.' [7 Am. & Eng. Ency. Law (2 Ed.), 371; Montgomery Gas Light Co. v. Railroad, 86 Ala. 372; Moakler v. Railroad, 18 Ore. 189; Woodell v. W. Va. Improvement Co., 38 W. Va. 23.]

" 'If the plaintiff or party injured, by the exercise of ordinary care under the circumstances, might have avoided the consequences of the defendant's negligece but did not, the case is one of mutual fault, and the law will neither cast all the consequences upon the defendant, nor will it attempt any apportionment thereof.' [Cooley on Torts (2 Ed.), 674.] The law will not permit a recovery where the plaintiff by his own negligence has contributed to produce the injury from which he has suffered. 'And it matters not whether the contribution consists in his participation in the direct cause of the injury, or in his omission of

duties which, if performed, would have prevented it. If his fault, whether of omission or commission, has been the proximate cause of the injury, he is without remedy against one also in the wrong.' [Little v. Hackett, 116 U. S. 371.]

"The record discloses that plaintiff, a man of mature years, in possession of all his faculties, with good eyes and hearing, familiar with the movements of trains, and, while momentarily expecting the arrival of one at the station upon which he intended to take passage, took a position on the platform so near the railroad tracks that a train could not pass without striking him, turned his face to the east when he was expecting a train from the west, and either fell asleep, or from some other cause became entirely oblivious to his surroundings, when by looking he could have seen the approaching train, or by listening he could have heard it. If such conduct was not under the circumstances contributory negligence, then the definition before given is inaccurate, for it clearly falls within it. In fact it is in effect admitted by counsel for plaintiff in his brief, that plaintiff was guilty of negligence in sitting upon the platform in the position he was in when struck, but plaintiff claims, that, notwithstanding his negligence, defendant's servants and employees in charge of the train could have avoided injuring him by the use of ordinary care and diligence, such as sounding the danger signals or stopping the train after they saw him, or could have seen him in a perilous position, and having failed to exercise such care and diligence that he is entitled to recover for the injuries sustained by him by reason thereof.

"There was no evidence tending to show any willful, wanton or reckless disregard of human life on the part of the engineer in charge of the train that caused the injury.

"The engineer was plaintiff's witness and testified that he was at his post of duty, and keeping a

lookout ahead of him. His train did not stop at this station, nor was any train due there at that time which carried passengers, so that he was not expecting any person to be on the platform, having no reason to anticipate their presence there. He testified that the first thing he discovered going to Elmdale was a man sitting on the platform with his head very low between his legs; he was facing the track, and was a foot or two from the end of the platform; that just about the time he saw him he struck him; was not over ten or fifteen feet from him when he first saw him, maybe not that much; that as soon as he saw him he applied the air; that he did nothing else, because he had no time until the engine struck him; that there was nothing to obstruct his view except plaintiff was sitting in the shade of the platform; that after he saw the man he could do nothing to stop the cars except to put on the emergency brakes which he did.

"In this case the contributory negligence of the plaintiff is a complete defense to the action, unless the conduct of the servants of the defendants managing the train was characterized by such willful, wanton or reckless disregard of human life also contributing to his death as that the defendants ought not to be heard to say that the plaintiff was guilty of such negligence."

Again in the case of Schmidt v. Railroad, 191 Mo. 215, at page 235, GANTT, J., in speaking for the court, said:

"Notwithstanding the conclusion we have reached, it is proper to note the contention of counsel for the plaintiff that the facts of this case bring it within the principle of Harlan v. Railroad, 65 Mo. 22, in which it was said: 'When it is said, in cases where plaintiff has been guilty of contributory negligence, that the company is liable, if by the exercise of ordinary care it could have prevented the accident, it is to be understood that it will be so liable, if by the exercise of reasonable care, after a discovery by defendant of

the danger in which the injured party stood, the acci-
dent could have been prevented, or if the company
failed to discover the danger through the recklessness
or carelessness of its employees, when by the exercise
of ordinary care would have discovered the danger
and averted the calamity.'

"In our opinion the foregoing excerpt is inappli-
cable to the facts of this case. The engineer did not
fail to discover the deceased near to and approaching
the track, nor did he fail to discover the danger to the
deceased by reason of any recklessness or carelessness
on his part, but the testimony shows that he was keenly
alive to the situation and immediately upon coming in
sight of the deceased, sounded the alarm whistle and
caused the bell to ring continually until he was struck.
He had a right to presume that a mature person in
broad daylight would not recklessly walk on a railroad
track immediately in front of a rapidly moving train,
and therefore, he only considered deceased was in
peril when he discovered that in spite of the danger
whistles and the ringing bell, the deceased indicated
he was about to step on the track, but there is no foun-
dation for saying that the engineer failed to discover
this condition by reason of his reckless running. While
the speed of his engine was in excess of that pre-
scribed by the ordinance, it was in no sense reckless.
It was the usual rate maintained at this point and the
brake was set and the speed was being lowered to stop
at the station. The engineer and fireman were both at
their post observing the track. The statement quoted
from Harlan v. Railroad, 65 Mo. 22, has no reference
to such a state of facts as was developed in this case.
Nor is this a case where a traveler has relied upon the
presumption that the employees were obeying the law
or ordinance and not running in excess of the speed
prescribed and has on that account been caught on the
track. This, as already said, is a case where a pedes-
trian has walked upon a railroad track in broad day-

light without even looking to see if a train was approaching and when, if he had looked, it would have been a physical impossibility for him to have failed to see the train.   There can be no presumption in the teeth of the facts developed in this case that the deceased looked for a train.   If he looked he saw the train, and if he saw it, he recklessly and negligently put himself in front of it and was killed, when one step backward or the refraining of taking one step would have wholly averted his injury and death.   The negligence of the deceased was *concurrent in point of time with the negligent running of the train and was the direct proximate cause of his death.*

"*We can only account for the conduct of the old gentleman on the ground that he had become oblivious to his surroundings and was wholly unconscious of his situation.*

"From whatever point of view we look at this record, we can but say that the deceased was negligent and that his negligence contributed to his death.

"It results that the circuit court erred in not sustaining the demurrer to the evidence and directing a judgment for the defendant, and its judgment is accordingly reversed.   All concur."

In Holland v. Railroad, 210 Mo. 338, BURGESS, J., again speaking for the court, said:

"It is ruled in Harlan v. Railroad, 64 Mo. 480, that every person who goes on a railroad track, or purposes to cross it, must use his eyes and ears to avoid injury, and that every intelligent person who has arrived at years of discretion is presumed to know that it is dangerous to be on a railroad track when trains are passing to and fro, and when crossing one is expected to be vigilant and watchful of the approach of a locomotive.   Failure to exercise such vigilance is negligence *per se*. These familiar principles have been many times announced by this court.   [Taylor v. Railroad, 86 Mo. 457; Prewitt v. Eddy, 115 Mo. 283; Baker

v. Railroad, 122 Mo. 533; Lane v. Railroad, 132 Mo. 4; Schmidt v. Railroad, 191 Mo. 215, l. c. 228.]

"Plaintiff, however, says that John Holland had the right to presume that defendant's train would not be run at a greater rate of speed than five miles an hour, and to act upon such presumption until he knew, or by the exercise of ordinary care ought to have known, to the contrary. The only evidence with respect to the speed of the train at the time of the accident was the testimony of the fireman, and, as stated before, he testified that the train was not then running at a rate of speed exceeding five miles an hour. In all of the cases relied upon by plaintiff as supporting her contention, namely, Hutchison v. Railroad, 161 Mo. 246; Eckhard v. Railroad, 190 Mo. 593; Riska v. Railroad, 180 Mo. 168; Weller v. Railroad, 164 Mo. 180, there was evidence tending to show that the train was running at a rate of speed in excess of that fixed by ordinance, or there was a failure to observe the requirements of the ordinance in some other respect. But even if the train in question was running at the time of the accident at a rate of speed in excess of that prescribed by the city ordinance (which we do not concede), and the defendant was, therefore, guilty of negligence *per se, the conduct of the deceased in going upon the track in proximity to the approaching train was contributory negligence on his part, which negligence was the proximate cause of the injury.*

"In Schmidt v. Railroad, supra, it is said: 'The rule of contributory negligence is not changed or abrogated by reason of a statute or ordinance imposing the duty on account of the violation of which the injury resulted. [Weller v. Railroad, 120 Mo. 653.] The statute does not absolve persons approaching a public railroad crossing from exercising common prudence to avoid danger, nor shift the responsibility to another should injury ensue from the failure to exercise it. [Kenney v. Railroad, 105 Mo. 284.]' The same rule is

announced in the following cases: Boyd v. Railroad, 105 Mo. 381; Sweeney v. Railroad, 150 Mo. 396; Moore v. Railroad, 176 Mo. 546; Evans v. Railroad, 178 Mo. 508; Ries v. Railroad, 179 Mo. 1.

"There is no escaping the conclusion that the deceased saw the approaching train. He must, therefore, have been absorbed in other matters, or have misjudged the speed of the train and determined to take the risk of being caught by it before he could cross the track. But, whatever may have induced his action, his conduct can only be characterized as the grossest recklessness. The demurrer interposed by the defendant to the evidence should have been sustained. The judgment is reversed. All concur."

In Felver v. Railroad, 216 Mo. 195, LAMM, J., expressly recognizes the doctrine that mutual and concurring negligence are fatal to plaintiff's recovery, and that unless after the engineer saw or might have seen that she was in a position of peril and *would not extricate herself therefrom,* she could not recover. In his clear and inimitable style he stated the rule as follows:

" 'Although you may believe from the evidence that the death of the plaintiff's husband was caused by defendant's negligence, yet if you further believe from the evidence that the deceased was guilty of negligence in driving upon the railroad track, and such negligence was concurrent with that of defendant, your verdict must be for the defendant.'

"The court refused it in that form but amended it by inserting before the words 'your verdict' the words 'and that deceased's negligence in being upon the track was the proximate cause of his death' and gave it as modified. Complaint is made of the modification. Of this complaint we observe: The instruction was properly refused at the outset. The law of the concrete case had been given on behalf of defendant in its eighth instruction, viz.:

"Lyman A. Felver, the deceased husband of plaintiff, was required under the law to exercise ordinary care—that is, such care as a reasonably prudent person under like circumstances would have exercised for his own safety, and unless he did so, the plaintiff cannot recover.

"It was his duty before driving on or so near the track as to be struck, to look and listen for passing cars, and unless you shall find from the evidence he did both look and listen, and looking could not see, or listening could not hear, the approaching car, then plaintiff cannot recover and this is true even though you may believe that the car was being run at a rapid rate of speed and the gong was not sounded; unless you shall further believe that after the motorman saw or might have seen that Felver, the deceased husband of plaintiff, was in a position of peril and *would not extricate himself therefrom, he had time to have stopped* the car before striking the wagon, with due regard to the safety of the passengers and negligently failed to do so, and unless you so believe, your verdict will be for the defendant, and on this issue the burden of proof rests upon the plaintiff.'

"The sixth instruction could only have the effect of bothering the jury in trying to reconcile its verbiage with the eighth. But counsel argue that, as given, it was bad and held out a false light to the jury. They say it told the jury that decedent's contributory negligence before it could operate as a defense must be the proximate cause of his death. They say that is not the law. That the correct rule is that where the negligence of decedent directly contributed with that of defendant to produce the injury there can be no recovery. [Hogan v. Railroad, 150 Mo. l. c. 55, and authorities cited.] *True it is that if there is mutual concurrent negligence in both parties there can be no recovery.* True, there is no comprative negligence in this State. True it is that concurrent negligence, that is, coinci-

dent in time and place, defeats recovery. But this case, as said, proceeds on the assumption that Mr. Felver was guilty of an antecedent act of negligence. It proceeds on the assumption that if defendant, after it had the last clear chance, neglected under the humanitarian rule to see his peril and avoid his injury by the exercise of ordinary care, then there should be a recovery. Keeping that distinction sharply in mind, while the amendment in terms was unhappy in the use of learned terminology, yet we cannot see how it materially affected the merits of the case when considered with defendant's eighth instruction, and with the whole trial theory of the case.

In Laun v. Railroad, 216 Mo. 563, at 578, GRAVES, J., said:

"Plaintiff's evidence is divisible into two classes, i. e., some witnesses say that deceased did not look until he got on the main track, or at least their language might by a strained construction be so construed, whilst others say he stopped and looked east, while he was between the two tracks. Grant it that deceased did not look for an approaching train until he was in fact upon the main track, what is the status of the plaintiff's case? If deceased failed to look and listen for an approaching train then he was guilty of negligence which would bar plaintiff's recovery, although the defendant was at the time guilty of negligence in running in excess of ordinance speed. Such has always been the rule in this State. In Schmidt v. Railroad, 191 Mo. l. c. 228-9, we said: 'The pivotal point upon which this case must turn is, did the circuit court err in overruling the demurrer to the evidence? That the train was running in excess of the rate of speed prescribed by the ordinance of Jefferson City is conceded and established by the testimony of the defendant's own engineer and fireman, as well as that of the plaintiff's witnesses. Such conduct on the part of

241 Sup.—15

the railway company was negligence *per se,* but notwithstanding this neglect of the regulations in regard to the running of trains within the city limits on the part of railroad employees, the question still remains, was not the deceased's own contributory negligence the proximate cause of his death?

"It is a settled law of this State that a person who goes upon a railroad track or proposes to cross it, must use his eyes and ears to avoid injury. And while a neglect of the regulations in regard to the running of trains amounts to negligence in law on the part of the railway company, this does not absolve pedestrians and others who propose to cross the tracks from the exercise of ordinary care. Every intelligent person who has arrived at years of discretion is presumed to know that it is dangerous to be upon a railroad track when trains are passing to and fro, and when crossing one, he is expected to be vigilant and watchful of the approach of the locomotive. The failure to exercise such vigilance is negligence *per se.*" [Harlan v. Railroad, 64 Mo. 482.]

One of the clearest statements of the law made by this court, to which my attention has been called, governing the respective rights and duties of railroad companies and trespassers walking upon their tracks is found in the case of Woods v. Railroad, 188 Mo. 229. On page 248, VALLIANT, J., in discussing those questions, said: "If the jury came to the conclusion, on the defendant's own testimony, that, after the engineer saw and realized the plaintiff's danger, he could, by the exercise of ordinary care, have averted the accident with the means at hand, yet failed to do so, we are not prepared to say that their verdict was unwarranted. But we rest the case on the proposition that there was substantial evidence on the part of the plaintiff to justify the submission of the case to the jury on the hypothesis that the plaintiff's foot had become fastened in the cattle-guard and she had fallen

before the train came in sight and that the defendant's servants saw her in peril and could have stopped the train in time to have averted the accident but neglected to do so.''

And again on page 257 to 258 we find the following:

''The plaintiff's case by her pleading, proof and instructions is based on the law as expressed by this court through BRACE, J., in Kellny v. Railroad, 101 Mo. l. c. 74, as. follows: 'We know of but one exception to the rule that where an injury is the product of the joint concurring acts of negligence of both plaintiff and defendant the plaintiff cannot recover, and that is an exeception made, on grounds of public policy and in the interest of humanity, to prevent and restrain, as far as may be, a willful, reckless or wanton disregard of human life or limb, or property, under any circumstances, and that is when the injury was produced by the concurrent negligent acts of both plaintiff and defendant, yet if the defendant before the injury, discovered or by the exercise of ordinary care might have discovered the perilous situation in which the plaintiff was placed by the concurring negligence of both parties, and neglected to use the means at his command to prevent the injury, then his plea of plaintiff's contributory negligence shall not avail him. This exception proceeds not upon the theory that the defendant has been guilty of another and independent act of negligence which is the sole cause of the injury and which must be charged as a separate and independant cause of action, but upon the ground that the negligence he was then in the very act of perpetrating was characterized by such recklessness, willfulness or wantonness as that he shall not be heard to say that the plaintiff was also guilty of contributory negligence.'

''The case concedes the plaintiff's negligence and asks to recover only on the ground that the defend-

ant's servants saw, or should have seen, her peril, and after becoming aware of it failed to avert the injury which they could have done with the means at hand if they had used ordinary care. That is the purport of the plaintiff's instructions, and the jury were authorized to give her a verdict only on satisfactory proof of such case. And the substance of the instructions given for the defendant was that the verdict should be for the defendant unless such case was proven; that if instead of the conditions asserted by the plaintiff the *facts were that the girls were walking or running on the track when the train came in sight, the engineer gave the whistle of alarm which they disregarded and instead of stepping off as they could have done continued to run in front of the coming engine and attempted to cross the cattle guard and plaintiff got her foot caught when the train was too close to be stopped in time although the engineer did his best to do so, then the verdict must be for the defendant.*"

Fox, P. J., announced the same rule in the case of Brockschmidt v. Railroad, 205 Mo. 435; and there are a score or more of other cases where this court has expressed similar views. Among which is Everett v. Railroad, 214 Mo. 54.

Now, if we apply the rule announced in the foregoing decisions to the case at bar, which it seems to me we must, then it is perfectly clear that plaintiff must be denied a recovery, for the reason that she was guilty of the grossest recklessness in climbing over defendant's cattle-guards, thereby trespassing upon its enclosed right of way and walking down its track a quarter of a mile without looking or listening for approaching trains, though full grown and possessed of all of her faculties, when she was perfectly familiar with the surroundings, and well knew that trains passed there hourly and were liable to approach her at any time. This reckless conduct of hers confessedly continued down to the very instant of the ca-

tastrophe; and even though it be conceded for the argument's sake that the defendant was in the first place guilty of negligence in not stopping the train, or slackening its speed, still that concession would avail her nothing, for the reason if that was true her negligence concurred with that of the defendant in point of time and place, and her injury necessarily was the result of their mutual negligence, which has always constituted a bar to a recovery in this, as well as in other states.

The evidence is uncontradicted that defendant sounded the regular crossing whistles at both the Terrill and Headinghouse crossings, which she could have heard had she been listening and paying proper care for her own safety. Everyone else in that vicinity heard them, and many of them were much further away. Both the engineer and fireman who were in charge of the engine which struck plaintiff testified that the bell was rung and the danger whistle was repeatedly sounded from the time they first had reason to apprehend she was not going to leave the track until she was struck. The engineer also testified that he first gave the danger signal when he was about six hundred feet from plaintiff and kept it up until she was struck, and there is no direct evidence which contradicts either of those witnesses, and none other for that matter except the deductions drawn by counsel for plaintiff from the comparative speeds of the two trains, before mentioned, which are entitled to but little weight, for the reason pointed out in a previous paragraph, and for the additional reason that opinions formed regarding the relative position of trains running at full speed in opposite directions, and as to the rate of speed of each, at best rises but little, if any, above the dignity of pure conjecture, especially when formed in the midst of a catastrophe when all eyes and attention are riveted upon the unfortunate victim thereof, as was the case here.

By so viewing this record it practically stands undisputed that plaintiff was repeatedly warned of her perilous position by the blasts of the whistle and the ringing of the bell from the time the engine got within six hundred feet of her down to the moment she was struck.

A score or more of other persons who were no more favorably situated than was the plaintiff heard these signals, and doubtless she could and would have done so had she been exercising ordinary care and reasonable prudence for her own safety. But whether she did or not is wholly immaterial in so far as defendant is concerned, for it discharged its full duty toward her by timely warning her of her perilous position.

If the train which struck plaintiff was running thirty miles an hour, which the evidence tended to show, then at the time of the injury it was running at a speed of about forty-four feet to the second, and consequently it must have taken about fourteen seconds for it to have run the six hundred feet just prior to striking her; and if the plaintiff was walking at an ordinary gait of four miles an hour, then she was moving about six feet a second, and consequently she must have walked down the track about eighty feet while the train ran said six hundred. Had she during that same time turned to the right or left, and that, too, without changing her gait, she would not only have cleared the track and been in a place of safety, but would have been about seventy-five feet either east or west of it when the train passed. This not only shows that the defendant gave her timely warning, but also proves that she was at least guilty of contributory negligence which directly contributed to her injury, if not guilty of the sole negligence which was the proximate cause thereof.

We are therefore, of the opinion that under no view of the case was the plaintiff entitled to a re-

covery, and for that reason the trial court should have sustained the demurrer to the evidence.

There are many other propositions presented and discussed by counsel for both plaintiff and defendant, but the conclusions before announced render it unnecessary to pass upon them.

The judgment of the circuit court should be reversed, and judgment here rendered for defendant.